IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NATIONAL STEEL CAR LIMITED, | ) | |
| | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 24-594-JLH-CJB |
| | ) | |
| FREIGHTCAR AMERICA, INC., | ) | ███████████████████ |
| FREIGHTCAR NORTH AMERICA, LLC, | ) | |
| JAC OPERATIONS, INC., AND | ) | |
| FCA-FASEMEX, LLC, | ) | |
| | ) | |
| Defendants/Counterclaim-Plaintiffs. | ) | |
| | ) | |

## LETTER TO THE HONORABLE CHRISTOPHER J. BURKE REGARDING FREIGHTCAR'S MOTION TO COMPEL

OF COUNSEL:
Safet Metjahic
Robert D. Keeler
ICE MILLER LLP
1500 Broadway, Suite 2900
New York, NY 10036
(212) 824-4940

Kenneth Sheehan
Kevin Adams
ICE MILLER LLP
200 Massachusetts Ave NW, Suite 400
Washington, DC 20001
(202) 824-8666

Dated: January 19, 2025

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
*Attorneys for National Steel Car Limited*

Dear Judge Burke:

Plaintiff National Steel Car Limited ("NSC") hereby opposes the letter brief filed by Defendants (or, "FreightCar") (D.I. 187, 197).

**FreightCar's Search Term Nos. 1 and 8**

**Term 1 -** ("Freight Car" OR FreightCar* OR FCA*) AND ("Canadian National" OR CN* OR presentation* OR slide* OR report* OR inspect* OR "site visit" OR analy* OR compar*)

This Term is Overbroad

Term 1 hits on more than thirty-four thousand (34,000) unique documents and nearly ninety thousand (90,000) documents with attachments. Ex. A. This Court has repeatedly held that a term that drives tens of thousands of hits is overbroad, and FreightCar agrees. D.I. 196-A, J; Ex. B, *Biogen Inc. v. Sandoz Inc.*, Civ. No. 22-01190-GBW, D.I. 364 (D. Del. June 17, 2024) (holding that "proposed search terms[,] which yield tens of thousands of hits[,]" were overbroad); Ex. C, *Orca Security, Ltd. v. Wiz, Inc.*, Civ. No. 23-00758-JLH-SRF, D.I. 139 (D. Del. Sept. 10, 2024) (holding that a search term that hits on "47,424 docs with families" to be overbroad); Ex. D, *Genesis Alkali Wyoming, LP v. Ciner Resources LP et al*, Civ. No. 18-01879-LPS-JLH, D.I. 67 (D. Del. Sep. 3, 2020) (holding that a search term that would require a party to review over 60,000 documents to be overbroad.). Accordingly, based on hit counts alone, Term 1 is overbroad.

Term 1 is also facially overbroad. In *Inpria Corp. v. Lam Research Corp.*, No. 22-01359, D.I. 310 (D. Del. Mar. 5, 2025) (Burke, M.J.) the Court held that terms having a conjunctive connector (like "AND") and long parentheticals with many ORs on either side are facially overbroad. Ex. E. Like *Inpria*, Term 1 uses many ORs on either side of a conjunctive connector. FreightCar's overuse of stemming (*) exacerbates the issue. Indeed, Term 1 as proposed by FreightCar results in more than 168-word combinations that will produce hits.[12] This is more than the 154 combinations for one of the terms that the Court rejected in *Inpria*. *Id*. Further, the Court in *Inpria* warns that using an extensive number of ORs can be used to circumvent the Default Standards' limit of ten search terms per party. And FreightCar admits to using Term 1 to seek three different categories of documents. D.I. 197 at 1. Accordingly, Term 1 as proposed by FreightCar is facially overbroad.

Further, FreightCar cites no authority that would permit Term 1 as written. FreightCar asserts that *Confluent Surgical, Inc. et al. v. HyperBranch Medical Technology, Inc.*, No. 1:17-cv-00688 (D. Del. Aug. 23, 2018) (Burke, M.J.) (D.I. 197-13) supports its position, but the Court there did not order the opposing party to use the proposed term. Instead, the Court ordered the proposing party to narrow the term by adding a second limiting phrase to its proposal, and explicitly permitted the opposing party to object to the new term as overly broad and raise that issue with the Court. FreightCar fails to address that the terms at issue in *Confluent* did not use

---

[1] The terms at issue in *Inpria* used more "OR" connectors but only used stemming (*) once. Therefore, FreightCar cannot distinguish that the proposed term generates a similar number of hit combinations as those identified in *Inpria*.

[2] 168 hit combinations result from each stemmed term having four alternate endings (e.g. as written, plural, possessive, and past tense). Because each stemmed term has more than four alternate endings (e.g., present progressive), the actual number of combinations is much larger.

SHAW KELLER LLP
The Honorable Christopher J. Burke
Page 2

long parentheticals filled with "OR" connectors and excessive stemming (*), as FreightCar does here. Accordingly, *Confluent* does not support FreightCar's use of Term 1.

<u>FreightCar Fails to Explain How Term 1 Seeks Relevant Information</u>

FreightCar also states that Term 1 seeks information relevant to obviousness and damages but never explains how. Instead, FreightCar contends that information captured by this term is relevant to willfulness to the extent that it may "rebut NSC's contention that inspecting a competitor's product is improper and evidence of willful infringement."[3] However, NSC does not contend that FreightCar's inspections of NSC's patent-practicing railcars, standing alone, are improper or evidence of willfulness. Rather, NSC contends that the fact that ███████████ █████████████████████████████████████████████████████████ ██████ nd measured and copied the same, in conjunction with it being a direct competitor that had prior knowledge of the asserted patents, is evidence of their willful infringement. D.I. 68 at ¶68; D.I. 196-E, K, M; D.I. 105 at 41. FreightCar has not accused NSC of willful patent infringement, or any sort of improper copying, so any information regarding NSC's purported inspections of railcars is irrelevant.

<u>NSC's Proposed Alternatives are Properly Tailored</u>

All three of NSC's narrowed alternatives (1) limit the number of false hits driven by the terms "Freight Car" or "CN*"; and (2) properly tailor the term to hit on ore cars, jennies, or terms related to the DMIR. As explained in the correspondence between the parties, the term "Freight Car" is generic in the industry and drives a large number of false hits, including newsletters and industry publications.[4] D.I. 196-R at 3. Likewise, the stemming "*" on "CN*" causes that term to hit on a large number of irrelevant documents and text, such as syntax associated with email correspondence. *Id*. Further, the only railcars at issue in this case are specially-designed ore cars or "jennies" used on the DMIR. All three of NSC's proposed alternatives are properly tailored, and NSC requests that this Court adopt one of the same. Exs. F-H.

**Term 8** - (jenny OR jennies OR "ore car" OR "freight car" OR "gondola car") AND (improve* OR advantage*)

This term is overly broad as it results in over eight thousand (8,000) unique hits and nearly thirty-four thousand (34,000) documents with attachments. Ex. A; *See* Ex. B, *Biogen Inc.*, No. 22-01190-GBW, D.I. 364. As NSC has explained to FreightCar, the terms "freight car" and "gondola car" are common terms in the railroad industry and drive many false hits, including newsletters

---

[3] NSC has already produced documents regarding inspections of railcars on the DMIR. The parties have an active discovery dispute regarding whether NSC needs to produce documents related to inspections of railcars not used on the DMIR. D.I. 147, 151, 158, & 161.

[4] FreightCar states that replacing "Freight Car" with "Freight Car America" is inappropriate because NSC refers to FreightCar as "Freight Car" in documents filed in this case. But that is not true. NSC has only ever referred to FreightCar as "FreightCar" without a space. NSC's proposed alternatives would capture this term.

SHAW KELLER LLP
The Honorable Christopher J. Burke
Page 3

and industry publications.[5] The use of such generic terms in the asserted patents, thus, does not provide a reason to compel NSC to use the terms as search terms. NSC's five proposed narrowed alternatives are properly tailored and one of the same should be adopted. Ex. F-H; D.I. 196-J at 3.

**RFP Nos. 61-63, 66-68, 71, and 73-74**

FreightCar falsely states that NSC has refused to identify whether it narrowed the scope of its search or production based on its objections. NSC wrote two separate letters to FreightCar describing how NSC limited its search and production of documents responsive to these Requests. Exs. I-J. FreightCar also moves on RFP No. 61 where NSC has already stated that it has performed a reasonable search for, and produced information responsive to, the full scope of the same. D.I. 189-A; Exs. I-J. FreightCar does not move in its opening brief (D.I. 197) on the same RFPs it included in the dispute letter (D.I. 187). Nor does it address all the RFPs it moved on in the brief itself (D.I. 197). Thus, to the extent FreightCar fails to identify or present argument regarding alleged deficiencies in NSC's production in response to an RFP, any such argument should be deemed waived.

RFP 62 and 66

NSC limited its production to communications with customers relating to the patented 2009 NSC rail cars sold for use on the DMIR.[6] Information and communications regarding "other Jennies" are irrelevant because no other NSC railcar practices the features claimed in the Asserted Patents. D.I. 158. Accordingly, the Court should not order NSC to produce such documents.

RFP 73

NSC limited its production of documents responsive to this Request to those relating to the Asserted Patents. FreightCar cannot explain why documents related to other patents are relevant or necessary to this matter. Accordingly, the Court should not order NSC to produce such documents.

RFP 63, 67, 68, 71, and 74

With the benefit of the briefing regarding these Requests, and in order to avoid burdening the Court by reducing the number of issues in dispute, NSC will search for and produce non-privileged documents responsive to these Requests.

---

[5] During the December 4 meet and confer, FreightCar requested that NSC provide hit counts for this term with "freight car" and "gondola car" removed and indicated that it would likely agree to that narrowing. D.I. 189-A, J at 3. NSC did so but, without explanation, FreightCar reneged on that offer and moved to compel instead. *Id.*

[6] The parties have an active discovery dispute regarding whether NSC need produce documents related to "other Jennies." D.I. 147, 151, 158, & 161.

SHAW KELLER LLP
The Honorable Christopher J. Burke
Page 4

Respectfully submitted,

*/s/ Andrew E. Russell*

Andrew E. Russell (No. 5382)


cc:    Clerk of Court (by CM/ECF & Hand Delivery)
       All Counsel of Record (by CM/ECF & Email)

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| NATIONAL STEEL CAR LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-594-JLH-CJB |
| | ) | |
| FREIGHTCAR AMERICA, INC., | ) | |
| FREIGHTCAR NORTH AMERICA, LLC, | ) | |
| JAC OPERATIONS, INC., AND FCA- | ) | |
| FASEMEX, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF KEVIN ADAMS IN SUPPORT OF
NSC'S SEPTEMBER 29 LETTER**

I, Kevin Adams, declare as follows:

1.    I am an attorney with the law firm Ice Miller LLP and counsel of record for Plaintiff National Steel Car ("NSC") in the above-captioned matter. I have personal knowledge of the matters set forth herein and if I am called upon to testify, I could and would testify competently thereto.

2.    FreightCar's search term No. 1[1] hits on thirty-four thousand and forty-five (34,045) unique documents, and eighty-nine thousand three-hundred and fifty-three (89,353) documents with attachments.

3.    FreightCar's search term No. 8[2] hits on eight thousand three-hundred and sixty-seven (8,367) unique documents, and thirty-three thousand five-hundred and ninety-six (33,596) documents with attachments.

---

[1] ("Freight Car" OR FreightCar* OR FCA*) AND ("Canadian National" OR CN* OR presentation* OR slide* OR report* OR inspect* OR "site visit" OR analy* OR compar*)
[2] (jenny OR jennies OR "ore car" OR "freight car" OR "gondola car") AND (improve* OR advantage*)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 19, 2026 in Baltimore, MD.


Date: January 19, 2026                                        _/s/ Kevin Adams_____
                                                                          Kevin Adams

1

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BIOGEN INC. and BIOGEN MA INC., | ) | REDACTED - PUBLIC VERSION |
| Plaintiffs, | ) | (Filed June 27, 2024) |
| v. | ) | C.A. No. 22-1190-GBW |
| SANDOZ INC. and POLPHARMA BIOLOGICS S.A., | ) | |
| Defendants. | ) | |

**LETTER TO THE HONORABLE GREGORY B. WILLIAMS FROM
ANNE SHEA GAZA IN RESPONSE TO PLAINTIFFS' JUNE 10, 2024 DISCOVERY
<u>DISPUTE LETTER</u>**

Dear Judge Williams:

Defendants Sandoz Inc. and Polpharma Biologics S.A. (collectively, "Defendants") submit this letter in opposition to Plaintiffs Biogen Inc. and Biogen MA Inc.'s (collectively, "Biogen's") motion to compel Defendants to run search terms as set forth in their letter brief (D.I. 356) ("Open. Br."). Contrary to Biogen's representation, Defendants have already conditionally agreed to run up to ten of Biogen's proposed terms across ten custodians. (Ex. A, June 7, 2024 Chivvis Email to Miller.) Biogen's belated motion at this late stage for discovery beyond that contemplated by the Default Standard is improper and its ask is impossible to accomplish under the Court's case schedule. Biogen's request should be denied.

## I.     Defendants Have Conducted a Reasonable Search for Responsive Documents

Defendants have been diligent and thorough in performing reasonable searches, collections, and review of documents responsive to Biogen's requests since the start of the discovery process. As Defendants repeatedly explained to Biogen, Defendants interviewed numerous custodians, collected documents – including emails – from relevant folders identified by these custodians, and reviewed hundreds of thousands of pages of material to identify the documents most relevant to the core issues in dispute. To date, Defendants have produced over two hundred and fifty thousand pages of documents responsive to Biogen's discovery requests, and are continuing to search, collect, and review additional documents for production, including email correspondence.[1] Defendants' produced documents reflect the development and manufacturing of Sandoz's natalizumab biosimilar, clinical research, launch strategy, marketing plans, and talking points for communications with third parties. (*See, e.g.*, Ex. B, POLPHARMA-0018497 (              ); Ex. C, SDZNAT-00217326 (talking points); Ex. D, SDZNAT-00217337-38 (Tyruko messaging); Ex. E, SDZNAT-00125254 (launch strategy).)

Biogen's motion rests on a false premise – that Defendants have refused to search for documents relevant to clinician communications or discussions comparing Biogen and Defendants' assays and refused to run search terms across e-mail. (*See* Open. Br. at 2.) To the contrary, Defendants have already produced documents that are directly responsive to these topics. (*See, e.g.*, Ex. F, SDZNAT-00220854 (clinician talking points); Ex. G, SDZNAT-00167497 (communication plans); Ex. H, SDZNAT-00214687 (biosimilar messaging); Ex. I, SDZNAT-00188157 at -163-65 (launch update); Ex. B; Ex. J, POLPHARMA-0022466 (FDA correspondence).) Further, Defendants have agreed to seven of Biogen's proposed terms against ten custodians and have already started producing documents that hit on those search terms. (*See* Ex. A; Ex. K, June 5, 2024 Chivvis Email to Miller.) Defendants have also agreed to run an additional three terms from Biogen if they return a reasonable number of hits. (Ex. A.)

---

[1] In its opening letter, Biogen compares the number of emails it produced to those produced by Defendants, but such comparisons are not the standard for reasonable discovery under the Federal Rules of Civil Procedure or the Default Standard and Biogen cites no supportive authority. (*See* Open. Br. at 1.) In addition, the comparison is inapt – Tysabri has been on the market since 2004, whereas Defendants only entered into an agreement in 2019 to develop a natalizumab biosimilar. Biogen has a broad commercial organization. Defendants have a limited, targeted scientific development campaign, whose relevance is even more limited due to the specific, collateral patents asserted by Biogen.

Biogen has not identified any specific documents that are missing from Defendants' production.  When Biogen previously identified specific information that it believes to be missing, Defendants endeavored to promptly produce relevant materials.  (*See e.g.*, D.I. 355 at Ex. 2; D.I. 355, Ex. 3 at 3.)  For example, when Biogen failed to obtain ████████ samples from Defendants' third-party vendor, Defendants negotiated and obtained those samples for Biogen.  (*See* Ex. L, Jan. 8, 2024 Dolphin Ltr. to Spieth at 1; Ex. M, Apr. 4, 2024 Miller Email to Dolphin.)  Biogen's motion relies on an unjustified claim that Biogen is entitled to some unspecified, threshold number of e-mail.  (*See* Open. Br. at 1-2.)  That is not enough to compel production.  *Cf. GlaxoSmithKline LLC v. Teva Pharms. USA Inc.*, No. 14-878-LPS-CJB, 2016 WL 859229, at *2 (D. Del. Mar. 3, 2016) ("[I]f the possible existence of some other relevant, non-produced documents was always enough to demonstrate good cause to abandon the Default Standard's requirements, the Standard would be worth little.").

## II.  Biogen's Request for Keyword Searches is Untimely and Unreasonable

Defendants have been fully transparent with Biogen about their document search and production methodology for the last 20 months.  In March 2023, Defendants made clear to Biogen that Defendants "have searched for Electronically Stored Information by interviewing custodians and identifying folders on computers and servers that the custodians have identified as likely to have responsive information. [Defendants] have collected those folders and then reviewed and produced the documents therein.  In many instances, this included emails, which [Defendants] have produced."  (D.I. 355, Ex. 2 at 3.)  In August 2023, Defendants again notified Biogen that Defendants "have been diligently interviewing potential custodians and working to track down additional potentially responsive sources of information."  (Ex. N, Aug. 27, 2023 Dolphin Email to Wilusz.)  In October 2023, Defendants again stated that Defendants "searched for electronically stored information, including emails, by interviewing custodians and identifying folders on computers and servers that the custodians have identified as likely to have responsive information."  (D.I. 355, Ex. 3 at 2.)  Defendants offered multiple times to negotiate a case-specific ESI protocol with search terms, but Biogen never engaged.  (*Id.* Ex. 2 at 4; *id.* Ex. 3 at 2.)  Nor did Biogen notify Defendants of its intent to use search terms for ESI discovery so that Defendants could use the procedures provided in the Default Standard.

Despite prior notice and ample opportunity to craft an ESI protocol months ago, Biogen now accuses Defendants of conducting an inadequate search of ESI solely on the basis that Defendants have not used search terms in its collection of documents.[2]  (Open. Br. at 1-2.)  But the Default Standard does not require the use of search terms for ESI discovery.  (*See* Default Standard ¶ 5(b) ("*If* the producing party *elects* to use search terms …") (emphasis added).)  Another court in this district has likewise declined to find a party's decision not to use search terms for ESI discovery to be "inherently unreasonable."  Order, *Topia Tech., Inc. v. Egnyte,*

---

[2] It was Biogen, not Defendants, who did not follow the Default Standard.  It failed to disclose its search terms as required by Paragraph 5(b) of the Default Standard until May 1, 2024, nearly two months after the deadline for substantial completion of document production and after Defendants asked explicitly, "Did Biogen use search terms to search for emails of its custodians in response to Sandoz's RFPs?"  (Ex. R, Apr. 30, 2024 Dolphin Ltr. to Spieth.)

2

*Inc.*, No. 21-1821-CJB (D. Del. Feb. 12, 2024), D.I. 228. The *eBuddy* case cited by Biogen does not provide otherwise, reflecting only that the Default Standard contemplates that email be included as part of an ESI collection and Defendants did so. (*See* Open Br. at 3.)

Biogen's decision to raise this discovery dispute as the parties reach the end of the discovery period is highly prejudicial to the Defendants. Biogen could have accepted Defendants' offer to negotiate ESI search terms at any point over the past one and half years. Likewise, Biogen could have disclosed its use of ESI search terms and requested reciprocity well in advance of the deadline for substantial completion of document production. Biogen refused to do so. Had Biogen done so, this dispute may have been averted or resolved at an earlier stage of the case. Biogen's ambush as the parties look to begin depositions imposes an impossible burden on Defendants, especially in view of the expansive breadth of the proposed search terms and limited time remaining in the discovery period.[3]

As Defendants have repeatedly explained, Biogen's requested search terms and custodians are overbroad and contradict the Default Standard's requirements. Biogen's broad search terms hit tens of thousands of documents. (Ex. O, May 20, 2024 Chang Email to Spieth; Ex. P, May 21, 2024 Chivvis Email to Spieth.) In addition, Biogen's proposal, as it relates to both terms and number of custodians, fails to comply with the Default Standard. First, Biogen improperly relies on product and company names such as Tysabri or Unilabs and uses extended connectors to create terms that cover multiple topics. *See* Default Standard ¶ 5(b) ("Focused terms, rather than over-broad terms (e.g., product and company names), shall be employed."). As a result, many of Biogen's overbroad terms will capture non-responsive and irrelevant documents. This concern is not hypothetical – based on the searches that Defendants are already running, many of the reviewed documents are entirely non-responsive, as Biogen has now realized. (*See, e.g.*, Ex. Q, June 6, 2024 Miller Email to Chivvis.) Second, Biogen is proposing 18 terms[4] across 14 custodians, *see* D.I. 356-1, whereas absent good cause, the Default Standard permits only ten additional terms and contemplates up to ten custodians[5]. *See* Default Standard ¶¶ 3(a), 5(b).

Defendants have acted proactively and practically. Defendants agreed to run up to ten proposed search terms across ten custodians, Biogen refused the compromise and refused to negotiate further, insisting that Defendants run the full set of Biogen's overbroad search terms across 14 custodians. To now require Defendants to review the full set of documents under such expansive search terms would be neither fair nor equitable and would reward Biogen for its delay and contravention of the Default Standard. Defendants remain open to further meet and confers with Biogen to determine an agreeable scope for search term discovery and any potential adjustments to the case schedule to accommodate the additional discovery.

---

[3] Contrary to Biogen's representation, Defendants did not avoid Biogen's requests to meet and confer. (*See* Ex. S, April 30, 2024 Dolphin Email to Spieth.)
[4] Biogen claims that its request is for Defendants to run ten search terms against 14 custodians, as set forth in its Appendix A. (*See* Open. Br. at 1, 3.) But Appendix A lists 18 terms in total, seven of which Defendants have already agreed to run. (*See* D.I. 356-1.)
[5] Since the infringement allegations here concern the same conduct across both Defendants, Sandoz and Polpharma should be treated as a single party under the Default Standard.

3

Case 1:22-cv-01590-JLB-CJB Document 376 Filed 06/27/26 Page 46 of 76 PageID #: 35289

# EXHIBIT O

| | |
|---|---|
| **From:** | Chang, Evelyn Li-Jin |
| **To:** | Spieth, Anita M. C.; Chivvis, Matthew Alan; Biogen Tysabri Litigation; MoFo-Sandoz-Natalizumab; Jacobs, Karen; Wilson, Samantha; Gaza, Anne Shea; Fahnestock, Derek |
| **Subject:** | RE: Summary of 5/14 Meet and Confer |
| **Date:** | Monday, May 20, 2024 5:29:42 PM |
| **Attachments:** | image001.png |
| | image002.gif |

Hi Anita,

Thank you for providing revised search terms. We have done a preliminary review of the search terms against certain custodial files (including emails) and the revised terms remain overbroad. We provide exemplary hit counts below – please note that these hit counts reflect only a subset of the 15 custodians you identified and a subset of the emails we have collected, as not all of the information is in a database on which searches of this type can be run:

- ("anti-natalizumab" or "anti-nata" or "anti-NTZ" or ADA or ANA) W/10 (antibod* or ab or assay or ELISA) – **14,429 documents**
- ("John Cunningham" or JCV or "JC Virus" or "anti-JCV" or "anti-JC virus") W/10 (antibod* or ab or assay or ELISA or Stratify or ImmunoWELL) – **19,583 documents**
- (Focus or Quest or "@questdiagnostics.com" or ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) W/25 ("John Cunningham" or JCV or "JC Virus" or "anti-JCV" or "anti-JC virus") – **11,549 documents**
- (GenBio or "Gen Bio" or "@genbio.com") W/25 ("John Cunningham" or JCV or "JC Virus" or "anti-JCV" or "anti-JC virus") – **10,833 documents**
- (PB006 or nata or natalizumab or NTZ) W/25 (Tysabri or Tyruko) – **42,367 documents**

We do not believe that such overbroad searches are appropriate at this advanced stage of discovery. Further, we note that Biogen continues to push for nearly 20 search terms. As a reminder, Section 5(b) of the Delaware Default Standard states that "a requesting party may request no more than **10 additional terms** to be used in connection with the electronic search." Please provide a revised set of no more than 5 search terms in addition to the 5 of Biogen's we previously said we would run.

On custodians, we think your proposal for 15 custodians is overbroad. We also note that one custodian, Mr. Alexander Ott (who you misidentify as Alexandra) is an attorney, and we do not think it would be productive to run searches on his ESI, as the vast majority of non-duplicative content in his files relating to matters in dispute is likely to be privileged. Please provide a narrowed list of, *e.g.*, 8. custodians across Sandoz and Polpharma.

Please let us know when we can expect a response from Biogen as to the five search terms that we have requested Biogen run on its ESI custodians, as well as the other issues we identified in our May 10 deficiency letter.

Best,
Evelyn

**Evelyn Chang**

Associate
evelynchang@mofo.com
T: +1 (650) 813-4033

Morrison Foerster
755 Page Mill Road
Palo Alto, CA 94304-1018



mofo.com | LinkedIn | Twitter

**From:** Spieth, Anita M. C. <aspieth@choate.com>
**Sent:** Friday, May 17, 2024 8:29 AM
**To:** Chang, Evelyn Li-Jin <EvelynChang@mofo.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>; MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Jacobs, Karen <KJacobs@morrisnichols.com>; Wilson, Samantha <SWilson@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Subject:** RE: Summary of 5/14 Meet and Confer

**External Email**

Evelyn and Matt:

While we await your hit reports, we considered the comments that Defendants raised on May 14, regarding the May 8 list of search terms and custodians. Given that Defendants have not provided a redline of the search terms (although they agreed to do so), Biogen has specifically addressed each of the Defendants concerns in the attached redline of the search terms, including removing the domain-based searching, adding distance limiters rather and "ANDing" or "ORing" terms together, and not using the word "index" independently.

Please run these search terms against the below-listed custodians and produce all responsive, relevant documents. Obviously, 3 total custodians for both defendants is far too few, as I said on our May 14 call. Biogen has attempted to identify the most relevant custodians, but reserve the right to request additional custodians.

**Sandoz**
1. Alexandra Ott
2. Ameriga Fanigliulo
3. Chad Woods
4. Jeffrey Robinson
5. Linda Staikos
6. Mike Bortnowski
7. Paul Delo

8.  Vicki Crafton

**Polpharma**
1. Alex Moulson
2. Chantel Tu
3. Karsten Roth
4. Klaas Ehrig
5. Rafal Derlacz
6. Sakshi Gupta
7. Tomasz Góralczyk

Anita

---

**From:** Spieth, Anita M. C. <aspieth@choate.com>
**Sent:** Friday, May 17, 2024 7:30 AM
**To:** Chang, Evelyn Li-Jin <EvelynChang@mofo.com>; Chivvis, Matthew Alan <MChivvis@mofo.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>; MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Jacobs, Karen <KJacobs@morrisnichols.com>; Wilson, Samantha <SWilson@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Subject:** Re: Summary of 5/14 Meet and Confer

Evelyn:

Please immediately send all hit reports you have created based on the search terms / custodians that Biogen sent on May 8. I asked for them on our meet and confer on May 14 and again in my follow up summary email.

Anita

---

**From:** Chang, Evelyn Li-Jin <EvelynChang@mofo.com>
**Sent:** Friday, May 17, 2024 12:05:42 AM
**To:** Chivvis, Matthew Alan <MChivvis@mofo.com>; Spieth, Anita M. C. <aspieth@choate.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>; MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Jacobs, Karen <KJacobs@morrisnichols.com>; Wilson, Samantha <SWilson@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Subject:** RE: Summary of 5/14 Meet and Confer

Counsel,

Please see the attached correspondence.

Best,

Evelyn

**Evelyn Chang**
Associate
evelynchang@mofo.com
T: +1 (650) 813-4033

Morrison Foerster
755 Page Mill Road
Palo Alto, CA 94304-1018



mofo.com | LinkedIn | Twitter

---

**From:** Chivvis, Matthew Alan <MChivvis@mofo.com>
**Sent:** Wednesday, May 15, 2024 6:55 PM
**To:** Spieth, Anita M. C. <aspieth@choate.com>; Biogen Tysabri Litigation <biogentysabri@choate.com>; MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Jacobs, Karen <KJacobs@morrisnichols.com>; Wilson, Samantha <SWilson@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Subject:** RE: Summary of 5/14 Meet and Confer

Hi Anita,

We plan to respond tomorrow with our comments on your search terms and the ones we are already running. We'll provide a date on which we intend to amend our responses then as well.

We will also respond on your other points and ours.

Matthew
415.268.7307

---

**From:** Spieth, Anita M. C. <aspieth@choate.com>
**Date:** Wednesday, May 15, 2024 at 9:39 PM
**To:** Biogen Tysabri Litigation <biogentysabri@choate.com>, MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>, Jacobs, Karen <KJacobs@morrisnichols.com>, Wilson, Samantha <SWilson@ycst.com>, Gaza, Anne Shea <agaza@ycst.com>, Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Subject:** RE: Summary of 5/14 Meet and Confer

**External Email**

Counsel:

When we spoke yesterday, Defendants committed to respond to my below summary email providing a date certain when Defendants would supplement their responses and objections to RFPs. Please respond with that information. Biogen also asks again for Defendants' redline of the list of search terms and custodians provided a week ago on May 8. If hit count reports exist, please provide those as well.

Thank you.

Anita

Anita Spieth



Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-4031
f 617-502-4031
aspieth@choate.com
www.choate.com

---

**From:** Spieth, Anita M. C.
**Sent:** Tuesday, May 14, 2024 6:10 PM
**To:** Biogen Tysabri Litigation <biogentysabri@choate.com>; MoFo-Sandoz-Natalizumab <MoFo-Sandoz-Natalizumab@mofo.com>; Jacobs, Karen <KJacobs@morrisnichols.com>; Wilson, Samantha <SWilson@ycst.com>; Gaza, Anne Shea <agaza@ycst.com>; Fahnestock, Derek <dfahnestock@morrisnichols.com>
**Subject:** Summary of 5/14 Meet and Confer

Counsel,

Please find a summary below of our lengthy meet and confer call today and what Biogen understands is the path forward. To the extent anything contained herein is not your understanding of the call, please indicate as such.

**Email Searching**

We understand Defendants are willing to run search terms across Sandoz and Polpharma custodial

files and that Defendants' agreement to do so does not impose a parallel requirement on Biogen. Defendants, however, reserve the right to request additional search terms from Biogen *not* tied to Defendants' current capitulation to email keyword searching.

Defendants indicated that they plan to start running (or have already started running) some of Biogen's proposed search terms in Sandoz and Polpharma's custodial files. You also agreed that you would redline Biogen's proposed search terms and proposed custodians (sent on May 8) to the extent Defendants believe certain search terms are overbroad. Defendants expressed that they already have hit reports for at least some of the search terms and/or proposed custodians. Please include those in your redline response. As we said, sharing of that information will facilitate Biogen's ability to understand Defendants' argument regarding search scope and ability to propose modifications to the searches with a goal of reasonable scope. Biogen looks forward to receiving Defendants' redline and hit report so that we can continue to negotiate search terms and custodians. Biogen also looks forward to receiving productions of responsive emails hitting on the search terms that you are already running.

Defendants stated on the call that they will not wait to start the process of email searching for terms Biogen deemed not overbroad (i) while Defendants update their written responses and objections to Biogen's RFPs and (ii) while the parties continue to negotiate terms Defendants believe are overbroad and/or number of custodians. We understand Defendants will be producing additional documents in the coming weeks, as represented on the call.

**Categories Outlined in Biogen's April 3 and April 26 Letters**

Biogen walked through each of the categories of deficiency, summarized in Biogen's April 3 and 26 letters. Biogen highlighted that, in each instance, Defendants have objected to most or all of the documents sought. Defendants stated – for certain categories – that their document collection, review, and production did not match the scope stated in Defendants' written objections and responses to Biogen's RFPs. As an overarching point, Defendants agreed to amend all of their responses to Biogen's RFPs to indicate the true scope of their agreement to produce documents. Biogen also understands Defendants have changed their position on all of the disputed categories of documents in Biogen's April 3 and April 26 letters, as further detailed below.

Prior to today's meet and confer, Biogen understood the parties were at impasse because Defendants' April 20 letter in response to Biogen's April 3 letter expressed that Defendants stood on their objections and Defendants did not respond to on a point-by-point basis to Biogen's April 26 letter. We are happy to hear that Defendants have reconsidered their positions and will amend your responses to Biogen's RFPs to indicate that you will conduct a reasonable search and investigation for the full scope of Biogen's document requests and collect, review, and produce the results. Defendants stated that they do not know when they can update their RFP responses, but that it would be in relatively short order. Defendants said that they would respond to this summary email with a date certain for RFP response supplementation.

Defendants indicated that any agreement to produce documents will be limited to documents identified by a reasonable search and investigation. As Biogen noted on the call, the "reasonable

search and investigation" limitation is appropriate, but does not mean that Defendants need only run the proposed email search terms. Defendants are in the best position to know where responsive documents can be found, and therefore may need to do additional reasonable searching beyond any terms proposed by Biogen or produce documents otherwise known to Defendants.

A detailed summary of each category from Biogen's letters is below.

- April 3 letter, #1 (p. 2): we understand you will collect, review, and produce documents responsive to Biogen's Request Nos. 8-12, 14, and 16-17 – namely, all internal Polpharma communications, as well as all communications between Polpharma and third parties (including Sandoz and/or GenBio *and not limited only to communications with the FDA*), concerning the development or regulatory approval of ImmunoWELL.

- April 3 letter, #2 (p. 3): we understand you will collect, review, and produce documents responsive to Biogen's Request No. 22 – namely all internal Polpharma communications, as well as all communications between Polpharma and third parties (*not limited only to communications with FDA*), concerning the development of Tyruko.

- April 3 letter, #3 (p. 3): we understand you will collect, review, and produce documents responsive to Biogen's Request No. 23 - namely all communications between Polpharma and ██████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ .

- April 3 letter, #4 (p. 3): we understand you will collect, review, and produce documents responsive to Biogen's Request No. 20 - namely all communications between Polpharma and ████████████████████████████████████████████████ ████████████████████████████████████████████

- April 3 letter, #5 (p. 3): we understand you will collect, review, and produce documents responsive to Biogen's Request No. 6 - namely all communications with hospitals and/or clinical investigators who conducted the Tyruko clinical study program.

- April 3 letter, #6 (p. 3-4): we understand you will collect, review, and produce documents responsive to Biogen's Request Nos. 13 and 16-18 – namely all documents and/or communications concerned Polpharma's efforts to obtain access to Stratify or any other anti-JCV antibody assay that will include communications with parties *other than Biogen*.

- April 3 letter, #7 (p. 4): we understand you will collect, review, and produce documents responsive to Biogen's Request Nos. 15-18 – namely all documents and/or communications concerning ████████████████████████████████████████████ ████████████████████████████████████████

- April 3 letter, #8 (p. 4): we understand you will collect, review, and produce documents responsive to Biogen's Request Nos. 17-18, 35-36, 46, and 52 – namely all documents,

communications, and/or contracts that relate in any way to in- or out- licensing Tyruko, any anti-JCV antibody assay, other technologies relating to the treatment of MS, and/or the Asserted Patents (or any rights related to the same). As discussed, we understand you may have additional objections to these requests to the extent there is confusion regarding the "other technologies relating to the treatment of MS" that Biogen is seeking. Please let us know if that is the case and we can clarify.

- April 3 letter, #9 (p. 5): we understand you will collect, review, and produce documents responsive to Biogen's Request Nos. 28-30 – namely documents sufficient to show whether and how often patients receiving Tyruko have undergone or will undergo anti-natalizumab antibody testing, and collect, review, and produce the results. We understand that at present, no such documents exist. As we discussed, please state so in your response, and state whether you will produce any such documents if they come into existence if and when Tyruko launches.

- April 3 letter, #10 (p. 5): we understand you will collect, review, and produce documents responsive to Biogen's Request Nos. 41 and 53-54 - namely all documents and/or communications concerning the potential reasonable royalty rate for the technology claimed in the Asserted Patents that will include documents beyond those that "support" only Defendants' position.

- April 3 letter, #11 (p. 5): we understand you will collect, review, and produce documents responsive to Biogen's Request Nos. 45 and 47-48 – namely all documents and/or communications that discuss the Asserted Patents.

- April 26 letter, Polpharma categories #1-4 (pp. 3-4) and Sandoz categories #1-4 (pp. 5-6): we understand you will collect, review, and produce documents responsive to Biogen's Request to Polpharma Nos. 15-18, 28-30, 35-36, 45-48, 52, 61, and 67-69 Biogen's Request to Sandoz Nos. 46, 49-50, 52, 54 and 56-59. Many of these documents overlap in category with the Polpharma documents identified further above.

Defendants stated on the call that, for some of the categories discussed above, Defendants are not aware that any non-privileged responsive documents exist.

We briefly discussed Defendants' May 10 letter, which, as Biogen said, Biogen is still investigating (given the timing of when it was received). As a preview of Biogen's written response, Biogen agreed to supplement its Rule 26 Disclosures. Biogen reiterated that it is willing to consider running additional email search terms. Biogen will respond in writing in more detail on a point-by-point basis. Biogen's goal is to provide a written response to Defendants May 10 letter by no later than next week. Biogen will try to beat that goal.

If I have missed anything in this summary, or if others have points to add, please do so.

Anita

Anita Spieth



Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t 617-248-4031
f 617-502-4031
aspieth@choate.com
www.choate.com

---

Choate Hall & Stewart LLP Confidentiality Notice:

This message is transmitted to you by or on behalf of the law firm of Choate, Hall & Stewart LLP. It is intended exclusively for the individual or entity to which it is addressed. The substance of this message, along with any attachments, may contain information that is proprietary, confidential and/or legally privileged or otherwise legally exempt from disclosure. If you are not the designated recipient of this message, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please destroy and/or delete all copies of it and notify the sender of the error by return e-mail or by calling 1-617-248-5000. If you are a resident of California, please see Choate's Notice to California Consumers Concerning Privacy Rights, which is posted on our website [click on Privacy Policy and scroll down to Section 8]. For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

---

================================================================

This message may be confidential and privileged. Use or disclosure by anyone other than an intended addressee is prohibited. If you received this message in error, please delete it and advise the sender by reply email. Learn about Morrison & Foerster LLP's Privacy Policy.
.

---

Choate Hall & Stewart LLP Confidentiality Notice:

This message is transmitted to you by or on behalf of the law firm of Choate, Hall & Stewart LLP. It is intended exclusively for the individual or entity to which it is addressed. The substance of this message, along with any attachments, may contain information that is proprietary, confidential and/or legally privileged or otherwise legally exempt from disclosure. If you are not the designated recipient of this message, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please destroy and/or delete all copies of it and notify the sender of the error by return e-mail or by calling 1-617-248-5000. If you are a resident of California, please see Choate's Notice to California Consumers Concerning Privacy Rights, which is posted on our website [click on Privacy Policy and scroll down to Section 8]. For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ORCA SECURITY LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-758-JLH-SRF |
| | ) | |
| WIZ, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

At Wilmington this **10th** day of **September, 2024**, the court having considered the parties' letter briefing on the pending discovery motions, (D.I. 132; D.I. 133; D.I. 134; D.I. 135), IT IS ORDERED that the discovery motions are addressed as follows:

**DEFENDANT'S ISSUES**

1. **Defendant's motion to compel Plaintiff to provide a complete response to Interrogatory No. 2 is GRANTED.** On or before September 25, 2024, Plaintiff shall supplement its response to Interrogatory No. 2 to identify additional responsive information from its August 30, 2024 ESI production and verify that it has no further responsive documents after a fulsome search in accordance with its agreement to do so. (D.I. 134 at 2; D.I. 132, Ex. 2 at 13, 18)

2. **Defendant's motion to compel Plaintiff to supplement its response to Interrogatory No. 4 is GRANTED-IN-PART.** Plaintiff shall supplement its response on or before September 25, 2024 to include corrected metadata for the documents previously produced in accordance with Plaintiff's agreement to provide that information. (D.I. 134 at 2 n.1) To the extent that Plaintiff included responsive information in its response to a separate interrogatory regarding first offer for sale, Plaintiff shall amend its response to Interrogatory No. 4 to include

those citations. (*Id.* at 2) The motion is DENIED without prejudice in all other respects because the response provides a sufficient narrative, and there is no dispute that Plaintiff has produced source code, git history, and technical documents from which the requested information can be ascertained. (D.I.132, Ex. 1 at 103-05)

**3. Defendant's motion to compel Plaintiff to produce non-privileged documents responsive to Request for Production No. 54 is DENIED without prejudice to renew in a narrowed form.** The request, which seeks all documents and communications relating to Plaintiff's competitors, is overbroad. Defendant shall narrow the request by limiting the topic and time period of the requested documents and communications. (D.I. 132, Ex. 2 at 5)

## PLAINTIFF'S ISSUES

**4. Plaintiff's motion to compel Defendant to supplement its response to Interrogatory No. 2 and make available for inspection source code modules for the Accused Product's accused functionalities is GRANTED-IN-PART.** Plaintiff's proposed order seeks an inspection of "all source code modules for the Wiz Accused Product's accused functionalities, including the features identified in Orca's infringement contentions and May 20, 2024 letter, including the Supply Chain Security feature, Runtime Sensor, and any other features relating to or using Wiz's agentless scanning, including all versions of that code and git history from 2020 to the present." (D.I. 133, Proposed Order) The motion is GRANTED with respect to the Supply Chain Security feature and the Runtime Sensor, as well as the source code change logs and git history from 2020 to the present for those specific features. The record before the court establishes that these functionalities fall within the scope of Plaintiff's claims and infringement contentions, as well as Defendant's response to Interrogatory No. 1 identifying components in the Accused Product related to the accused functionalities. (D.I. 133 at 2; Ex. E at 10-17; Ex. A

2

at 7-9; Ex. J at WIZ_0032973) As such, they are relevant to allegations of copying because they show the timing of the development of Defendant's Accused Product. (*Id.*, Ex. F at 5; D.I. 124 at &para&para 16-28) Defendant shall make the Supply Chain Security and Runtime Sensor source code modules available for inspection on or before September 18, 2024 and shall supplement its response to Interrogatory No. 2 on or before September 25, 2024. The motion is DENIED without prejudice to the extent that it seeks "any other features relating to or using Wiz's agentless scanning" because the requested relief is overbroad.

**5. Plaintiff's motion to compel Defendant to supplement its response to Interrogatory No. 6 and produce all documents relating to the development and operation of the accused functionalities is GRANTED-IN-PART.** Defendant does not dispute that Plaintiff proposed a mutual exchange of search terms to be run against JIRA tickets during a meet and confer. (D.I. 135 at 4) On or before September 18, 2024, the parties shall engage in a mutual exchange of search terms to be run against JIRA tickets and shall engage in a meet and confer promptly following the exchange. (*Id.*, Ex. 2 at 4) On or before September 25, 2024, Defendant shall run the agreed-upon search terms, produce the responsive JIRA tickets, and supplement its response to Interrogatory No. 6 to verify that the foregoing production was made.

**6.** Plaintiff's motion is DENIED without prejudice in all other respects. Plaintiff seeks the production of prior source code versions and git history information. (D.I. 133, Proposed Order) Plaintiff acknowledges that Defendant already produced two versions of its code from May 20, 2023 and April 22, 2024, and it fails to articulate why this production is insufficient. (*Id.* at 3) Plaintiff explains in conclusory fashion that git history would show "when features and functions were added, modified, or altered, including through engineers' notes and comments." (*Id.*) But Plaintiff does not identify specific features or functions it wants to investigate or how

3

those specific features and functions are tethered to the claims in this case. Consequently, the request is overbroad and not proportional.

7. **Plaintiff's motion to compel Defendant to produce all documents responsive to Request for Production Nos. 84-90 is DENIED without prejudice.** (D.I. 133, Ex. H) Plaintiff has not established how Defendant's communications with, valuations of, and potential acquisition of ThreatOptix, a third-party cloud security company offering agent-based technology, are relevant to Plaintiff's claims and prayer for relief. There is no dispute that the ThreatOptix product is agent-based, and Defendant does not offer the product. (D.I. 135 at 4) On this record, Plaintiff has not shown how Defendant's accused agentless functionality is comparable to ThreatOptix's agent-based technology.

8. **Plaintiff's motion to compel Defendant to produce documents responsive to Plaintiff's "cloud native" ESI search term for the four primary custodians is DENIED without prejudice.** There is no dispute that this term comprises multiple terms and exceeds the agreed limit of 10 terms per custodian. (D.I. 108 at 1; D.I. 133, Ex. I at 2-3) This results in a burdensome number of hit counts. (D.I. 133, Ex. I at 1-2) This ruling is without prejudice to further efforts by the parties to narrow the term.

9. **Conclusion.** For the foregoing reasons, IT IS ORDERED that:

- Defendant's motion to compel Plaintiff to provide a complete response to Interrogatory No. 2 is GRANTED, and Plaintiff shall supplement its response n or before September 25, 2024 in accordance with this Memorandum Order.

- Defendant's motion to compel Plaintiff to supplement its response to Interrogatory No. 4 is GRANTED-IN-PART. On or before September 25, 2024, Plaintiff shall supplement its response to include corrected metadata for the documents previously produced, and

4

Plaintiff shall amend its response to include citations to documents regarding first offer for sale. The motion is DENIED without prejudice in all other respects.

- Defendant's motion to compel Plaintiff to produce non-privileged documents responsive to Request for Production No. 54 is DENIED without prejudice to renew in a narrowed form.

- Plaintiff's motion to compel Defendant to supplement its response to Interrogatory No. 2 and make available for inspection source code modules for the Accused Product's accused functionalities is GRANTED-IN-PART. The motion is GRANTED with respect to the Supply Chain Security feature and the Runtime Sensor, as well as the source code change logs and git history from 2020 to the present for those specific features. Defendant shall make the Supply Chain Security and Runtime Sensor source code modules available for inspection on or before September 18, 2024 and shall supplement its response to Interrogatory No. 2 on or before September 25, 2024. The motion is DENIED without prejudice in all other respects.

- Plaintiff's motion to compel Defendant to supplement its response to Interrogatory No. 6 and produce all documents relating to the development and operation of the accused functionalities is GRANTED-IN-PART. The motion is GRANTED-IN-PART with respect to the JIRA tickets. On or before September 18, 2024, the parties shall exchange search terms and meet and confer on those terms. On or before September 25, 2024, Defendant shall run the agreed-upon search terms, produce the responsive JIRA tickets, and supplement its response to Interrogatory No. 6 to verify that the foregoing production was made. Plaintiff's motion is DENIED without prejudice in all other respects.

5

- Plaintiff's motion to compel Defendant to produce all documents responsive to Request for Production Nos. 84-90 is DENIED without prejudice.

- Plaintiff's motion to compel Defendant to produce documents responsive to Plaintiff's "cloud native" ESI search term for the four primary custodians is DENIED without prejudice.

IT IS FURTHER ORDERED that the discovery dispute teleconference scheduled for September 11, 2024 at 3:00 p.m. is CANCELLED.

**10.** Given that the court has relied upon material that technically remains under seal, the court is releasing this Memorandum Order under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Memorandum Order should be redacted, the parties shall jointly submit a proposed redacted version by no later than **September 17, 2024,** for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within fourteen (14) days of the date the Memorandum Order issued.

**11.** This Memorandum Order is filed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R. Civ. P. 72(a), and D. Del. LR 72.1(a)(2). The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Memorandum Order. Fed. R. Civ. P. 72(a). The objections and responses to the objections are limited to four (4) pages each.

6

**12.** The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the court's website, www.ded.uscourts.gov.

Sherry R. Fallon
United States Magistrate Judge

**From:** Krissy.McKenna@lw.com <Krissy.McKenna@lw.com>
**Sent:** Friday, July 19, 2024 12:47 PM
**To:** Lacey, Catherine <clacey@wsgr.com>; Blake.Davis@lw.com; Lucas.Lonergan@lw.com; Ryan.Banks@lw.com; Prasad, Praatika <pprasad@wsgr.com>; WSGR - Orca Wiz <WSGR-Orca-Wiz@wsgr.com>; Cottrell@RLF.com; Farnan@RLF.com; haynes@rlf.com
**Cc:** orcasecuritywiz.lwteam@lw.com; RSmith@morrisnichols.com; JBlumenfeld@MNAT.com
**Subject:** RE: Orca v. Wiz | Priority ESI Requests

EXT - krissy.mckenna@lw.com

Caty,

We agree that one party should not have to review significantly more total documents than the other. Currently, Wiz is asking Orca to review 30,000 <u>more</u> documents than Wiz (not even accounting for the documents hitting on Orca's cloud native term that Wiz refuses to review), but in the interest of compromise, Orca has agreed to move forward with productions.

Regarding your newly raised concern about the hit counts for Orca's cloud native search term, we note that: (1) this is an about-face from your position during at least the July 17 meet and confer, in which you agreed that Orca's revisions to the term resolved your hit count concerns but did not address your relevance objection; (2) Wiz has repeatedly argued that the overall count is the relevant metric, as opposed to individual search term counts, and as noted above, Orca's overall count is 30,000 hits lower than Wiz's; and (3) Wiz's own "access" term hit on roughly <u>double</u> the amount of documents (over 94,000), but in the spirit of compromise, Orca agreed to move forward with production.

Regarding your concern that the cloud native term comprises multiple terms, as Orca explained in email correspondence and during the parties' meet and confers, Orca objected to multiple of Wiz's terms as comprising more than one search term. Yet, again, in the interest of compromise Orca agreed to move forward with production. It is notable that Wiz refuses to offer Orca the same courtesy.

Finally, we have attached an updated version of the teleconference motion. We do not find it helpful to the Court at this stage, where no letter briefing will be provided until September, to provide the search term language as opposed to a summary of what the term is directed at, which Wiz notably conceded in its July 12 email (agreeing that "components of the term [] could seek potentially relevant information regarding the measure of damages in the case"). We also think the Court should be provided with the context that Wiz refuses to produce any documents in response to this term as opposed to merely objecting to it. We have otherwise accepted your edits. Given the 5pm ET deadline, please let us know by 4pm ET if Wiz signs off on this updated copy and whose signature we should include for Wiz.

Best,
Krissy

**From:** Lacey, Catherine <clacey@wsgr.com>
**Sent:** Friday, July 19, 2024 2:44 PM
**To:** McKenna, Krissy (BN) <Krissy.McKenna@lw.com>; Davis, Blake (Bay Area) <Blake.Davis@lw.com>; Lonergan, Lucas (Bay Area) <Lucas.Lonergan@lw.com>; Banks, Ryan (OC) <Ryan.Banks@lw.com>; Prasad, Praatika <pprasad@wsgr.com>; WSGR - Orca Wiz <WSGR-Orca-Wiz@wsgr.com>; Cottrell@RLF.com; Farnan@RLF.com; haynes@rlf.com
**Cc:** #C-M ORCA SECURITY - WIZ - LW TEAM <orcasecuritywiz.lwteam@lw.com>; RSmith@morrisnichols.com; JBlumenfeld@MNAT.com
**Subject:** RE: Orca v. Wiz | Priority ESI Requests

2

Krissy,

Thank you for putting the motion for teleconference together.  Attached are our edits to the motion.  As we have maintained throughout the meet and confers, it does not make sense for Wiz to have to review significantly more total documents than Orca in connection with the Priority Requests, especially because Orca is purporting to withhold terms for later.  We also note that the specific term in the motion is still returning significant hits (deduped across custodians O365: 47,424 docs with families, Slack: 10,667 docs), and more than the 10,000 per custodian you proposed as a threshold in prior correspondence (although we maintain the overall burden of the Requests is the more important consideration).  In addition, we have explained in prior meet and confers and correspondence our position that this comprises multiple terms.  Therefore, while we are willing to move forward with the other terms at this time, we reserve the right to make arguments as to this term based on all of our objections, not just limited to relevance as indicated in your first draft of the motion.  We also continue to reserve our right to make objections based on overall burden in connection with future requests.

Please let us know if this motion is acceptable to Orca, or provide any further edited version for us to review before filing.

Thanks,
Caty

**From:** Krissy.McKenna@lw.com <Krissy.McKenna@lw.com>
**Sent:** Friday, July 19, 2024 9:04 AM
**To:** Lacey, Catherine <clacey@wsgr.com>; Blake.Davis@lw.com; Lucas.Lonergan@lw.com; Ryan.Banks@lw.com; Prasad, Praatika <pprasad@wsgr.com>; WSGR - Orca Wiz <WSGR-Orca-Wiz@wsgr.com>; Cottrell@RLF.com; Farnan@RLF.com; haynes@rlf.com
**Cc:** orcasecuritywiz.lwteam@lw.com; RSmith@morrisnichols.com; JBlumenfeld@MNAT.com
**Subject:** RE: Orca v. Wiz | Priority ESI Requests

EXT - krissy.mckenna@lw.com

Caty,

In the event Wiz will not withdraw its objection to the cloud native term, attached is a motion for teleconference to be filed by 5pm ET today consistent with the ESI Agreement deadline. Please let us know if Wiz will withdraw its objection or, if not, whether Wiz is signed off on this motion so we can get it on file.

Best,
Krissy

**From:** McKenna, Krissy (BN)
**Sent:** Thursday, July 18, 2024 9:42 PM
**To:** 'Lacey, Catherine' <clacey@wsgr.com>; Davis, Blake (Bay Area) <Blake.Davis@lw.com>; Lonergan, Lucas (Bay Area) <Lucas.Lonergan@lw.com>; Banks, Ryan (OC) <Ryan.Banks@lw.com>; Prasad, Praatika <pprasad@wsgr.com>; WSGR - Orca Wiz <WSGR-Orca-Wiz@wsgr.com>; Cottrell@RLF.com; Farnan@RLF.com; haynes@rlf.com
**Cc:** #C-M ORCA SECURITY - WIZ - LW TEAM <orcasecuritywiz.lwteam@lw.com>; RSmith@morrisnichols.com; JBlumenfeld@MNAT.com
**Subject:** RE: Orca v. Wiz | Priority ESI Requests

Caty,

# Exhibit D

ORAL ORDER: Having reviewed Ciner's motion regarding discovery disputes (D.I. 63 ) and the associated letter briefing and exhibits (D.I. 65, 66), it is HEREBY ORDERED that Ciner's request is DENIED. The Court agrees with Ciner that the search term in dispute is likely to identify relevant documents; however, the Court is persuaded by Genesis's argument that Ciner's request is not focused and is overbroad. Having reviewed the submitted exhibits, the Court agrees with Ciner that Genesis's proposed alternative to Ciner's term is underinclusive, but it appears to the Court that other, more focused search strings discussed by the parties may be sufficient to identify the information sought. For example, it appears that one or both of the two search strings discussed on the bottom of Exhibit 8 to Ciner's letter (D.I. 65-1, Ex. 8 at 4) would hit on the document set forth as Exhibit 6 (id., Ex. 6). The Court also acknowledges and relies upon Genesis's statement that it "stands ready to respond to reasonable requests for documents." (D.I. 66 at 2.) Thus, for example, if there was reason to believe that other documents of the same type as the document set forth as Exhibit 5 to Ciner's letter (D.I. 65-1, Ex. 5) are relevant to any party's claim or defense, the Court is confident that the parties can negotiate production of such relevant documents. IT IS FURTHER ORDERED that the September 4, 2020 teleconference is CANCELLED. ORDERED by Judge Jennifer L. Hall on 9/3/2020. (ceg) (Entered: 09/03/2020)

As of September 4, 2020, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Genesis Alkali Wyoming, LP v. Ciner Resources LP et al*
1-18-cv-01879 (DDE), 9/3/2020, docket entry 67



September 2, 2020

Via E-Filing
The Honorable Jennifer L. Hall
J. Caleb Boggs Federal Building
844 N. King Street
Unit 17, Room 3124
Wilmington, DE 19801-3555

**FILED UNDER SEAL
HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL EYES ONLY**

Re:     ***Genesis Alkali Wyoming, LP v. Ciner Resources LP, et al.,***
          <u>**C.A. No. 18-cv-1879-LPS-JLH**</u>

Dear Judge Hall:

Genesis Alkali is the plaintiff and patent holder in this case. Ciner is the defendant and runs the accused process in soda ash mining plants in Turkey. If Genesis had demanded every email relating to the accused process, that would have been overbroad. Indeed, Ciner has refused to conduct such a search. For the accused infringer to request every email referring *to the plaintiff's non-accused process* is beyond the pale.

The Delaware Electronic Discovery Default Standard, which Judge Stark has incorporated into the Scheduling Order here, *see* D.I. 33 ¶ 1, requires "[f]ocused terms, rather than over-broad terms (e.g., product and company names)[.]" Ciner has not adequately explained why its "ELDM" proposal is necessary at all, let alone "focused" and not "over-broad." Ciner's demand that Genesis review and potentially produce over 60,000 emails and files referring to the term "ELDM" is overbroad and should be denied.

## I.     Technical background of the '497 patent

The patent in suit is U.S. Patent No. 6,589,497 (the "'497 patent"), entitled "Process for preparing soda ash from solution mined bicarbonate brines." Ex. A. Soda ash is an important industrial chemical and one of the key constituents of glass, and the '497 patent teaches and claims a continuous, optimized process for producing high-grade soda ash from a solution-mined brine, also known as "mine brine."

Water is flushed into a mine and recovered as mine brine, which is rich in minerals. The claimed process involves the use of two crystallizers: a monohydrate crystallizer and a decahydrate crystallizer. The monohydrate crystallizer creates sodium carbonate monohydrate crystals, and the decahydrate crystallizer creates sodium carbonate decahydrate crystals. *See* Ex. A at 15:37-16:3, 16:4-8. The ultimate goal is to obtain dried sodium carbonate monohydrate crystals, commonly known as "soda ash." *See, e.g., id.* at 4:23-25, 5:4-6.

The prior art described creating mine brine, feeding it first to a deca crystallizer to form deca crystals, melting the deca crystals and then feeding the melted crystals in a solution with water to a mono crystallizer, to create crystals with a single water molecule, before final processing. *See*

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

*id.* at 2:1-32. In the art, this was called "ELDM," which stood for **E**vaporation/stripping, **L**ime (i.e., neutralization), **D**ecahydrate process, **M**onohydrate process.

The '497 patent optimizes the ELDM process by reversing the order of the ELDM's last two elements, and requires that a portion of the mine brine be sent first to the monohydrate crystallizer and only then recycled to the decahydrate crystallizer. *See id.* at 3:5-15. This is known now as "ELMd." The little "d" reflects that the size of the deca crystallizer can be reduced substantially, resulting in significant cost savings. *See id.* at 14:9-16. The ordering is reflected in the three steps explicitly called out in claim 1: evaporation/stripping, monohydrate crystallization, and decahydrate crystallization. It was this ordering that the '497 patent's examiner found to be inventive. *See* D.I. 51 (Joint Claim Construction Chart) Ex. C at GENESIS00000546.

**II.** ████████████████████



Contrary to the impression left in Ciner's letter, Genesis has not withheld information relating to the operation of the Genesis Green River plant. ████████████████████
████████████ Genesis stands ready to respond to reasonable requests for documents and additional information on this topic.

**III.    Argument**

Ciner's request runs afoul of the Delaware Electronic Discovery Default Standard, which Judge Stark incorporated into the Scheduling Order. D.I. 33 ¶ 1. Under ¶ 5.b of the Delaware Electronic Discovery Default Standard, "[f]ocused terms, rather than over-broad terms (e.g., product and company names), shall be employed."

"ELDM" is not a focused term. ELDM is not the accused process, and Genesis is the patent holder, not the infringer. The Green River plant is called the "ELDM plant," and so, the number of hits that "ELDM" will generate will be enormous. Indeed, a preliminary search returned over 60,000 hits. The Default Standard gives as an example of overbreadth "product names." ELDM

2

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL EYES ONLY**

is at the same level of abstraction as a product name—it is the name of the process used to produce soda ash.  The term is overbroad.

Ciner's demand is all the more objectionable because Ciner has not demonstrated why it needs detailed information about Genesis's process in the first place.  Nor has it addressed why Genesis's interrogatory response and ongoing document production of process flow diagrams is insufficient.  Searching 60,000+ "ELDM" emails and files about the day-to-day operation of the plant is not narrowly tailored to provide information relevant to this case.  It is designed to drive up Genesis's litigation costs.

Finally, Ciner has flatly refused to search its own ESI using the same technical-related search-term strings that they have proposed to Genesis.  Ciner has not even agreed to search its own ESI with regard to its process at all, and when challenged on this issue, Ciner responded only that they will produce "documents sufficient to show the Defendants' processes used to manufacture the accused soda ash."  *See* Ex. B (Aug. 18 letter from A. Cohen to J. Gribbin).  Yet under ¶ 1.b of the Delaware Electronic Discovery Default Standard, "[p]arties are expected to use reasonable, good faith *and proportional* efforts to preserve, identify and produce relevant information."  In other words, Ciner demands that Genesis search and review 60,000+ emails and files with regard to a prior-art ELDM process that is not even at issue in the case, yet refuses to apply its own process-related search-term proposals to its own ESI at all.  Ciner is not being reasonable, nor is it using proportional efforts to produce its own relevant information.

Genesis respectfully requests that the Court deny Ciner's motion for ESI discovery on "ELDM."

Respectfully submitted,

/s/ Brian E. Farnan

Brian E. Farnan

cc: Counsel of Record (Via E-Mail)

3

# Exhibit E

ORAL ORDER: The Court, having reviewed Plaintiff's discovery dispute motion ("Motion"), (D.I. 228 ), which would require Defendant to (1) run certain disputed search terms (the "Disputed Search Terms") and (2) search the ESI for numerous additional custodians, as well as the briefing related thereto, (D.I. 229 ; D.I. 234 ; D.I. 240 ), hereby ORDERS as follows:  (1) With respect to the Disputed Search Terms, Plaintiff's request is DENIED.  It is not just that the terms are said to generate approximately 1 million additional documents that would need to be reviewed.  (D.I. 234 at 1-2; id., ex. AI); see also Biogen Inc. v. Sandoz Inc., Civil Action No. 22-1190-GBW, D.I. 364 (D. Del. June 17, 2024) (holding that "proposed search terms[,] which yield tens of thousands of hits[,]" were overbroad).  Or that Defendant says that the cost to review those documents will be between $1.85 and $2.5 million (an argument that would have been even stronger had it been accompanied by a sworn declaration).  (D.I. 234 at 1); see also "Guidelines for Discovery Disputes" at para. 7 (found in the "Guidelines" tab on Judge Burke's portion of the District Court's website, and cited in the Court's November 7, 2024 Oral Order); State Farm Mut. Auto. Ins. Co. v. Amazon.com, Inc., Civil Action No. 22-1447-CJB, D.I. 146 (D. Del. Feb. 15, 2024). It is that one can tell from just looking at the Disputed Search Terms that they are really overbroad in their scope—such that they violate the Delaware Default Standard's requirement that "[f]ocused terms" must be used for ESI searching.  District of Delaware Default Standard for Discovery, Including Discovery of Electronically Stored Information ("ESI") (hereafter, "Default Standard") at para. 5(b).  Although the terms at issue do use a conjunctive connector (like "AND" or "w/2"), on either side of those connectors are long parentheticals filled with an innumerable number of "OR" connectors—for example, as many as 34 different "OR" connectors are used in the first disputed term alone (resulting in what is said to be a possible 285 different combinations).  (D.I. 234 at 1) This type of indiscriminate searching simply cannot be termed sufficiently "focused" for the Default Standard's purposes.  And with all of those "ORs" being used, at some point it simply isn't fair to consider such a term to be "one" search term at all.  Cf. In re Google Litig., No. C 08-03172 RMW (PSG), 2011 WL 6113000, at *3 (N.D. Cal. Dec. 7, 2011).; (2) With respect to the additional ESI custodian issue, the request is also DENIED.  Paragraph 3(a) of the Default Standard provides for a default number of 10 custodians whose ESI Defendant must search; Defendant has identified those 10 people (a diverse array of contributors in its executive, technical, marketing, and engineering spaces, some of whom supervise a number of the additional custodians that are at issue here).  (See D.I. 239 , ex. AD; D.I. 234 at 3); see also Default Standard at paras. 3(a), 5(b).  If Plaintiff wishes that additional Defendant custodians' information should be searched, it has the burden to "show good cause as to why more [custodians] should be required."  United States v. Gilead Scis., Inc., Civil Action No. 19-2103-MN-CJB, D.I. 247 (D. Del. Dec. 21, 2021).  Plaintiff has submitted a 15-page list relating to what apparently totals out to a request for 50 additional custodians – an incredibly large number to be requested at one time, at least in the Court's experience in this District as to competitor patent cases.  (D.I. 230 , exs. B & J)  A winning request here would be focused—one targeted to an additional, cabined number of persons, that makes a detailed showing, in a nuanced, person-specific manner, as to why that person is likely to have not just relevant but also non-cumulative information (as compared to the information in the possession of the10 custodians initially selected by the other side).  See State Farm Mut. Auto. Ins. Co., D.I. 146 (assessing, in a large competitor

patent case, the plaintiff's request that the defendant—who had agreed to search for ESI from 12 custodians (a number later reduced to 9 after certain of those employees left the company)—should be required to search the ESI of four additional persons—and doing so by investigating specific arguments about those four new custodians, and the extent to which they would have duplicative information to the others already on defendant's list).  But Plaintiff's request is not that.  Instead, Plaintiff has simply included 15 pages of charts listing 50 people, and pointing therein (at a high level) to the proposed custodians' job titles, or to the fact that they were referenced in discovery documents.  (D.I. 231 , ex. B; see also D.I. 234 at 3); and (3) If in the future, Plaintiff can make a more focused showing as to additional search terms to be run or custodians to be searched, it may re-raise those issue with Defendant (and with the Court if necessary). Ordered by Judge Christopher J. Burke on 03/05/2025. (sam) (Entered: 03/05/2025)

As of March 6, 2025, PACER did not contain a publicly available document associated with this docket entry. The text of the docket entry is shown above.

*Inpria Corporation v. Lam Research Corporation*
1-22-cv-01359 (DDE), 3/5/2025, docket entry 310

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INPRIA CORPORATION

        Plaintiff,

    v.

LAM RESEARCH CORP.,

        Defendants.

Case No. 1-22-cv-01359-CJB

REDACTED - PUBLIC VERSION
Filed: November 27, 2024

## DEFENDANT'S LETTER BRIEF IN ANSWER TO
## PLAINTIFF'S LETTER BRIEF REQUESTING DEFENDANT RUN
## <u>DISPUTED SEARCH TERMS AND DESIGNATE ADDITIONAL CUSTODIANS</u>

John V. Gorman (DE Bar No. 6599)
Amy M. Dudash (DE Bar No. 5741)
MORGAN, LEWIS & BOCKIUS LLP
1201 N. Market Street, Suite 2201
Wilmington, Delaware 19801
Telephone:  302.574.3000
john.gorman@morganlewis.com
amy.dudash@morganlewis.com

*Attorneys for Defendant Lam Research Corp.*

Dated:  November 20, 2024

Dear Judge Burke,

The motion of Plaintiff Inpria Corporation ("Inpria") to compel the production and review of its disputed search terms and additional 50 custodians should be denied as overly burdensome and not proportional to the needs of the case.

**Disputed Search Strings.**  Defendant Lam Research Corp. ("Lam") has entertained several rounds of ESI search term reformations by Inpria—none of which have led towards "hit counts" that "are reasonable and proportional to the needs of the case." D.I. 190 at ¶ 5.d.iii.  Lam has proceeded with four of Inpria's ESI search terms, but the remaining six are far from "reasonably 'focused'" to 'locate potentially responsive ESI' that is not cumulative."  D.I. 229 at 2 (quoting Default Standard ¶ 5(b)). Inpria represents the disputed terms (*i.e.*, Terms 3, 5, 6, 7, 9, and 10) result in "214,159 unique hits," and asserts, without support, that this number of hits is "a reasonable size for this case." D.I. 229 at 2, Ex. E.  The four agreed-upon terms, along with Lam's affirmative terms, hit on 241,597 documents that Lam will review for production.  Inpria's disputed terms alone hit on an *additional* 999,557 documents with family that will need to be promoted for review. *See* Ex. AI. Based on counsel's estimate, the cost to review the additional documents that would need to be promoted based on the disputed search terms would be between $1.85 and $2.5 million.

Although Inpria highlights its use of "a connector (*e.g.*, 'w/3')" (D.I. 229 at 2), it overlooks that Terms 3, 5, 6, 7, and 10 use the "w/3" connector as part of a much longer parenthetical filled with "OR" connectors.  By using the conjunctive "AND" between two parentheticals containing long sets of terms with disjunctive "OR" connectors, Inpria effectively asks Lam to produce any document containing any of 1,428 possible combinations.  Take Term. 5 for example:



The first "OR"-based parenthetical (yellow) contains 15 terms, and the second "OR"-based parenthetical (green) contains 19 terms (counting "(⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛)" as 3 terms), resulting in 285 possible combinations (*e.g.*, ⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛).  This does not even account for every variation of the stemmed terms (*e.g.*, sale and sales are variations targeted by "sale*").  Likewise, Term 3 results in 272 combinations; Term 6 results in 242 combinations; Term 7 results in 247 combinations; Term 9 results in 154 combinations; and Term 10 results in 228 combinations.  Thus, Inpria's use of "a connector" is not a "reasonable search limitation strateg[y]." D.I. 229 at 2.

Further, Terms 3, 5, 6, 7, and 10 use several alternatives in the second, main parenthetical that demonstrate the terms' overbreadth.  For example, each of "⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛)" is directed to metal oxide films generally, without specifying the application or layer.  As such, they capture etch or patterning products in connection with metal oxide films— which are not accused.  As another example, each of "⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" refers to precursors to make metal oxides for *any*

1

applications; none specifically relate to any of the accused Aether products, which are directed to manufacturing processes utilizing metal-oxide at the *photoresist* layer. As yet another example, each of ██████████████████████████████████ refers to part of a compound—*i.e.*, the terms are not full chemical names.

Term 9 is similarly overbroad in that it seeks documents hitting on "Aether" within two terms of any generic numbering (*i.e.*, ████████████████) or a series of initialisms beginning with "G." But Lam often uses "G" as part of a naming convention for its products. *See, e.g.*, Ex. AA, Syndion "GP"; Ex. AB, Kiyo "G-Series"; Ex. AC, DSiE G Series. As a result, Term 9 hits on documents and communications related to irrelevant, unaccused products.

Inpria's lengthy "OR"-based parentheticals confirm the problem. Inpria could identify 10 search terms. D.I. 190 at ¶ 5.d.iii. While "OR" connectors may be proper for capturing variants of the same word, they are <u>not</u> appropriate to circumvent the 10-term limit, as Inpria seeks to do here. *See, e.g., Villery v. Crounse*, 2022 WL 1154405, at *3 (E.D. Cal. Apr. 19, 2022) ("The magistrate judge reasonably and correctly found the search terms … were 'in the disjunctive' and thus … exceeded the … numerical limit outlined in discovery and scheduling order."); *In re Google Litig.*, 2011 WL 6113000, at *3 (N.D. Cal. Dec. 7, 2011).

Inpria's case citations are inapt. In *Abbvie, Inc. v. Boehringer Ingelheim Int'l GMBH*, 2018 U.S. Dist. LEXIS 99812, at *7 (D. Del. Jun. 14, 2018), the number of documents returned by the searches was unlikely to exceed 45,000—a fraction of the millions of hits from Inpria's requested searches. Likewise, Inpria cites *Frontier Commc'ns Corp. v. Google Inc.*, 2014 WL 12606321 (D. Del. Feb. 3, 2014)—which pre-dates Rule 26's proportionality amendment—for the ordinary premise that "[d]iscovery costs are to be balanced against the requesting party's interest in seeking the discovery of relevant information." If anything, *Frontier* supports Lam. The special master found the "search terms and connectors" to be "insufficient" and ordered revisions. *Id.* at *4.

Lam should not be compelled to review and produce **nearly 1.2 million** documents in response to Inpria's overbroad and unduly burdensome search terms.

**<u>Additional Custodians.</u>** In accordance with Paragraph 3(a) of the Default Standard for Discovery, Lam identified "[t]he 10 custodians most likely to have discoverable information in their possession, custody or control." Default Standard ¶ 3(a). Ex. AD (Lam's Amended ESI Disclosures). For each, Lam identified the "role in [the] instant dispute" and the "subject of information" for which the custodian is likely to have discoverable documents. *Id.* at 3. Lam's identified custodians span the subject matter relevant to the claims and defenses in this case, such as technical issues, marketing, business development, sales, and <u>finances related to the Accused Products; the conception of the Accused Products</u>; and Lam's ██████████████████████ ███████████████. Each of these subjects of information encompasses the types of information sought by Inpria by way of the additional custodians: "third-party customers, collaborators and partners of Lam; (2) research and development of the accused products; and (3) business and marketing of the accused products." D.I. 229 at 3. Contrary to Inpria's assertion, Inpria has not met its burden to "show good cause as to why more [custodians] should be required" than allotted by the Default Standard. *United States v. Gilead Scis., Inc.*, No. 1:19-cv-02103-MN-CJB, D.I. 247 (D. Del. Dec. 21, 2021).

First, as noted above, Inpria's ESI search terms remain unresolved.  While Inpria contends that it will miss out on relevant ESI without the 50 additional custodians, it has yet to review the full scope of ESI captured by Lam's affirmative search terms and the four Inpria terms which Lam agreed to run.[1]  If, *after* the review of ESI, Inpria believes that additional custodians are required, then it can raise these purported deficiencies for discussion with Lam. Until then, Inpria cannot show good cause for exceeding the 10-custodian limit.[2]

Second, Inpria fails to show why the additional custodians would have unique information beyond the information of those 10 custodians already identified.  This is especially true where, as discussed *supra*, Inpria has not reviewed the information for the already-identified custodians.  Beyond the general statement that the additional custodians are "believed to have unique and essential information relating to" third-parties, research and development, and business and marketing, Inpria can only point to a Lam document wherein each person was named.  Ex. B.  That is not the standard to exceed the 10-custodian limit.  If it were, every patent case involving a large company would spiral into an abyss of ESI custodians.

Even so, Inpria overlooks that several of the additional custodians work directly with the already-identified custodians on the relevant subject matter.  *See, e.g.,* Ex. AF (LAM_0016546, showing IMEC-related team comprises identified custodians Weidman and Wise plus several of the additional custodians); Ex. AG (LAM_0011521, showing several of the additional custodians report directly to Wise and Subramonium—identified custodians with knowledge of the business and marketing); Ex. AH (LAM_0009876, identifying 7 of the additional custodians alongside already-identified custodians as authors of presentation on research and development of Aether).

Inpria's reliance on *LifeScan, Inc. v. Smith*, 2023 WL 7089662 (D.N.J. Oct. 11, 2023) is misplaced.  As *LifeScan* explains, "significant deference is given to a responding party's choice of records custodians" and "the requesting party must show that the responding party either withheld relevant documents or failed to conduct a reasonable search." *Id.* at *8 (internal quotations omitted).  Here, under the Default Standard, Lam identified the 10 custodians most likely to have discoverable information and exercised its discretion to "determine the method by which [it] will collect documents." *Id.* at *7.  For example, Lam identified the key decision makers (*e.g.*, Messrs. Wise, Subramonium, and Gottscho) responsible for technical and business aspects of the Aether products, which encompasses Lam's work with third-party customers and partners.  That tangential individuals *may* have additional information does not justify the burden of collecting and reviewing documents for additional custodians.  *Wang v. Univ. of Pittsburgh*, 2023 WL 5944114, at *4 (W.D. Pa. May 22, 2023) (denying motion to compel additional custodians that were merely named on the face of documents when decision makers were identified as custodians).

---

[1] Lam has been reviewing ESI of its Paragraph 3(a) custodians that hit on Lam's affirmative search terms and Inpria's four acceptable terms.  Lam produced approximately 800 ESI documents hitting on these search terms on November 19, 2024 and continues to produce ESI on a rolling basis.

[2] Attempting to circumvent the Default Standard and the agreed-upon Supplemental ESI Order, Inpria recently served 50 document requests seeking "[a]ll Documents, Communications, and Things in the possession, custody, or control of [each of the 50 custodians]" relating to the purported basis of relevance as identified in Ex. B of D.I. 231. Ex. AE.

Respectfully submitted,

*/s/ John V. Gorman*

John V. Gorman (DE Bar No. 6599)

c: Counsel of Record (via CM/ECF)

# Exhibit F



| 1500 Broadway | 29th Floor | New York, NY 10036 |

WRITER'S DIRECT NUMBER: (212) 824-4961
EMAIL: ROBERT.KEELER@ICEMILLER.COM

September 29, 2025
**Via Electronic Mail (justin.gillett@knobbe.com)**
Mr. Justin Gillett
Knobbe Martens Olson & Bear LLP
2040 Main St., 14th Fl.
Irvine, CA 92614

> *RE:* **Search Terms for ESI**
> *National Steel Car Limited v. FreightCar America, Inc.*, Civ. No. 24-00594

Dear Justin,

We write regarding the meet and confer held between the parties on Friday, September 26, 2025, regarding search terms.

**NSC's ESI**

**NSC's Search Terms for NSC's ESI**
Terms 1 and 11
FreightCar stated that they do not propose additional edits to these terms. FreightCar requested that NSC provide verification that a search for a " " [space] will capture a "/" (e.g. ""12 816,660" will capture "12/816,660"). NSC stated that it will.

**FreightCar's Search Terms for NSC's ESI**
Term 1 ("Freight Car" OR FreightCar* OR FCA*) AND ("Canadian National" OR CN* OR presentation* OR memo* OR slide* OR report* OR inspect* OR "site visit" OR analy* OR compar*)

This term would require NSC to review nearly 90,000 documents. NSC proposes the narrowed alternative: ("Freight Car America" OR FreightCar* OR FCA*) AND ("Canadian National" OR CN* OR presentation* OR memo* OR slide* OR report* OR inspect* OR "site visit" OR analy* OR compar*) AND ("Duluth" OR Minnesota OR Wisconsin OR "ore car")

NSC's narrowed alternative reduces the number of documents that hit on the search term (with attachments) to a more reasonable 2,948 documents. Please confirm that FreightCar agrees to this alternative.

Term 2b ("Canadian National" OR CN*) AND (presentation* OR slide* OR problem* OR hinge* OR require* OR want* OR prefer*) with date range 01.01.2007-09.11.2009 and 01.01.2018-12.31.2023.

This term would require NSC to review nearly 130,000 documents. NSC proposes the narrowed alternative: (`"Canadian National" OR CN`) AND (`presentation* OR slide* OR problem* OR requirement* OR want* OR prefer*`) AND (`Duluth OR "ore car"`) with updated date range 01.01.2008-09.11.2009 and 01.01.2019-12.31.2023.

NSC's narrowed alternative reduces the number of documents that hit on the search term (with attachments) to a more reasonable 5,088 documents. Please confirm that FreightCar agrees to this alternative.

Term 3 `@cn.ca AND (ARI* OR Greenbrier* OR GBR* OR Trinity*)`

This term would require NSC to review nearly 8,000 documents. NSC proposes the narrowed alternative: `@cn.ca AND (ARI OR Greenbrier OR GBR OR Trinity)`

NSC's narrowed alternative reduces the number of documents that hit on the search term (with attachments) to a more reasonable 1,304 documents. Please confirm that FreightCar agrees to this alternative.

Term 7 `"web continuity" OR ("side wall" AND (support* OR stiffen* OR reinforce*) AND (vertical* OR align*))`

This term would require NSC to review nearly 12,500 documents. NSC proposes the narrowed alternative: `"web continuity" OR ("side wall" AND (support* OR stiffen* OR reinforce*) AND (vertical* AND align*))`

NSC's narrowed alternative reduces the number of documents that hit on the search term (with attachments) to a more reasonable 7,593 documents. Please confirm that FreightCar agrees to this alternative.

Term 8 `(jenny OR jennies OR "ore car" OR "freight car" OR "gondola car") AND (improve* OR advantage*)`

This term would require NSC to review nearly 34,000 documents. NSC proposes the narrowed alternative: `(jenny OR jennies OR "ore car") AND (improve* OR advantage*) AND (Duluth OR "CN" OR "Canadian National")`

NSC's narrowed alternative reduces the number of documents that hit on the search term (with attachments) to a more reasonable 5,399 documents. Please confirm that FreightCar agrees to this alternative.

**FreightCar's ESI**

**NSC's Search Terms for FreightCar's ESI**

Term 1 `550043*`

2

FreightCar agreed to use this search term to search its ESI.

Term 2 (NSC OR "National Steel Car") w/15 patent*

NSC agrees to this term. Please confirm FreightCar agrees to use this term to search its ESI by Friday, October 3.

Term 3 (DMIR OR "Duluth Missabe and Iron Range" OR "ore car") AND (CN OR "Canadian National" OR @cn.ca)

FreightCar agreed to provide an alternative. Please do so Wednesday, October 1.

Term 4 (Inspect* OR report) AND ("NSC" OR "National Steel Car" OR CN OR "Canadian National" OR DMIR OR "Duluth Missabe and Iron Range" OR "ore car")

FreightCar agreed to provide an alternative. Please do so by Wednesday, October 1.

Regards,

Robert D. Keeler

3

# Exhibit G



| 1500 Broadway | 29th Floor | New York, NY 10036 |

WRITER'S DIRECT NUMBER: (212) 824-4961
EMAIL: ROBERT.KEELER@ICEMILLER.COM

November 6, 2025

**Via Electronic Mail (justin.gillett@knobbe.com)**
Mr. Justin Gillett
Knobbe Martens Olson & Bear LLP
2040 Main St., 14th Fl.
Irvine, CA 92614

>    *RE:*    **Search Terms**
>    *National Steel Car Limited v. FreightCar America, Inc.*, Civ. No. 24-00594

Dear Justin,

We write to further memorialize the meet and confer held between the parties on November 4, during which we discussed search terms, and in response to your November 5, 2025 letter.

**Search Terms**

NSC provided compromise offers regarding search terms in its September 29 letter. FreightCar waited a month before responding on October 30, and rather than cooperating with NSC to determine acceptable search terms, demanded that NSC agree to FreightCar's search terms. Under that ultimatum, NSC would be required to review an additional 210,000 documents and, if FreightCar agreed to NSC's search terms, it would review an additional 70,000 documents (for the terms for which it provided hit counts). This is unduly burdensome, especially given the broad search terms NSC used to target responsive documents.

Regardless, NSC remains willing to continue its good faith efforts to engage with FreightCar regarding search terms and replies to FreightCar's November 5 letter as follows.

**NSC's Search Terms for NSC's ESI**

Term 11

NSC confirms its term 11 is as follows:

```
"8166892" OR "8,166,892" OR "12 780,741" OR "2011 0041724" OR
"20110041724" OR "8132515" OR "8,132,515" OR "12816,660" OR
"12816660" OR "12 816,660" OR "2010 0251922" OR "20100251922"
OR "2678447" OR "2678605" OR "12559,065" OR "12 559,065" OR
"12559065" OR "200405.00128" OR "200405.00139" OR "Railroad
gondola car structure and mechanism therefor"
```



| 1500 Broadway | 29th Floor | New York, NY 10036 |

**NSC's Search Terms for FreightCar's ESI**

<u>Terms 3 and 4</u>

NSC's proposed term 3 is: (DMIR OR "Duluth Missabe and Iron Range" OR "ore car") AND (CN OR "Canadian National" OR @cn.ca)

FreightCar's proposed the alternative term 3: (DMIR OR "Duluth Missabe and Iron Range" OR "ore car") w/5 (CN OR "Canadian National" OR @cn.ca)

NSC's proposed term 4 is: (Inspect* OR report) AND ("NSC" OR "National Steel Car" OR CN OR "Canadian National" OR DMIR OR "Duluth Missabe and Iron Range" OR "ore car")

FreightCar's proposed the alternative term 4: (Inspect* OR report) AND (DMIR OR "Duluth Missabe and Iron Range")

FreightCar has refused to provide hit counts for NSC's original terms and the proposed alternatives above. In fact, at the November 4 meet and confer FreightCar stated that it did not see how hit counts were relevant. This is despite FreightCar's requests for hit counts from NSC and their refusal to agree to the original terms on the basis that they would require FreightCar to review an overly burdensome number of documents.

Regarding term 3, FreightCar complains that documents that hit on "DMIR" or "ore car" but which are not close to "CN" are "false hits," without further explanation. Indeed, NSC included the stand-alone term "DMIR" as one of its search terms for its own ESI.

Regarding term 4, FreightCar has claimed that this term would require FreightCar to review <u>both</u> "hundreds of thousands of documents" and "seventy thousand documents." FreightCar provides no explanation for the disparity in these figures, nor has it provided any explanation for its proposed narrowing.

Terms 3 and 4 seek documents that are at the heart of this dispute, including, for example, documents regarding FreightCar's intentional copying of NSC's patent-practicing railcars and communications with Canadian National regarding the Accused Products. Any narrowing of these terms requires careful consideration by NSC to ensure it is receiving the discovery to which it is entitled. NSC cannot properly consider FreightCar's proposals without hit counts both for NSC's original term and FreightCar's alternatives. Please provide the same immediately.



| 1500 Broadway | 29th Floor | New York, NY 10036 |

**FreightCar's Search Terms for NSC's ESI**

Term 1

FreightCar's current proposal for this term would require NSC to review over 90,000 documents. This is overly burdensome. NSC offered an alternative in their September 29 letter, which FreightCar has ignored. For the first time, in FreightCar's November 5 letter, FreightCar states that NSC's September 29 proposal excludes responsive documents. However, NSC has not agreed to produce all documents regarding inspections and the parties have an active discovery dispute regarding the same.

Further, FreightCar has failed to propose a sufficiently narrowed search term that would capture documents which mention FreightCar. NSC's September 29 narrowing to limit this term to capture documents related to ore cars or the DMIR is consistent with the scope of discovery to which the parties have agreed to date.

Regardless, in an effort to reach a mutually acceptable resolution with FreightCar, NSC proposes the following compromise, which removes false hits for the generic terms "Freight Car" and "CN" and narrows the term to focus on open top hoppers and ore cars:

```
("Freight Car America" OR FreightCar* OR FCA*) AND
("Canadian National" OR CN) AND (("open hopper"~3) OR "ore car"
OR jenn*) AND (presentation* OR slide* OR inspect* OR "site
visit" OR analy* OR compar* OR report*)
```

NSC's narrowed alternative reduces the number of documents that hit on the search term (with attachments) to about 2,500 documents. Please confirm that FreightCar agrees to this alternative.

Term 2b

FreightCar's current proposal for this term would require NSC to review 130,000 documents. This is unduly and overly burdensome. NSC offered an alternative in its September 29 letter, which FreightCar has not responded to. Further, FreightCar again misstates NSC's commitments made during the September 26 meet and confer, where NSC offered to provide an alternative that reduces the number of false hits for the CN* term. NSC did so.

Regardless, in yet another effort to reach a mutually acceptable resolution with FreightCar, NSC proposes the following compromise: `("Canadian National" OR CN) AND (("open hopper"~3) OR "ore car") AND (problem* OR hinge* OR require* OR want* OR prefer*)` for the time periods 2007.01.01-2009.09.11 and 2018.01.01-2023.12.31.

NSC's narrowed alternative reduces the number of documents that hit on the search term (with attachments) to about 12,000 documents. Please confirm that FreightCar agrees to this alternative.



| 1500 Broadway | 29th Floor | New York, NY 10036 |

<u>Terms 3 and 7</u>

On October 31, NSC agreed to terms 3 and 7. For the sake of clarity, these terms are:

    3. `<email=*@cn.ca> AND (ARI* OR Greenbrier* OR GBR* OR Trinity*)`

    7. `"web continuity" OR ("side wall" AND (support* OR stiffen* OR reinforce*) AND (vertical* OR align*))`

In accordance with the Default Standard, NSC will apply these search terms for documents dated before September 9, 2009—that is, in addition to documents dated from six years prior to the filing of the Complaint (D.I. 1).

<u>Term 8</u>

NSC did not state that this term should be tied to the patents at issue during the September 26 meet and confer. Instead, NSC asked FreightCar to clarify what documents it seeks with this term and even suggested the Asserted Patents as a possible answer. FreightCar refused to answer. To date, FreightCar has not articulated to NSC what relevant documents it is seeking with this search term.

Regardless, in yet another effort to reach a mutually acceptable resolution with FreightCar, NSC proposes the following compromise: `(jenny OR jennies OR "ore car" OR "gondola car") AND ("Canadian National" OR "CN") AND (improve* OR advantage*)` for the time periods 2007.01.01-2009.09.11 and 2018.05.17-2023.12.31.

NSC's narrowed alternative reduces the number of hits for the search term (with attachments) to about 5,500 documents. Please confirm that FreightCar agrees to this alternative.

**<u>NSC's Non-Email ESI</u>**

As NSC has repeatedly stated, NSC collected its non-custodial ESI and reviewed each document manually. Applying search terms to the collected ESI would be a duplicative effort. As we have previously offered, please let us know if you would like us to identify the specific file paths NSC collected in its ESI disclosures, noting that you already have them in the metadata produced with the documents.

Regards,

Robert D. Keeler

# Exhibit H



| 1500 Broadway | 29th Floor | New York, NY 10036 |

WRITER'S DIRECT NUMBER: (212) 824-4961
EMAIL: ROBERT.KEELER@ICEMILLER.COM

December 3, 2025

**<u>Via Electronic Mail (justin.gillett@knobbe.com)</u>**
Mr. Justin Gillett
Knobbe Martens
2040 Main St., 14th Fl.
Irvine, CA 92614

      ***RE:***    *National Steel Car Limited v. FreightCar America, Inc.*, Civ. No. 24-00594

Dear Justin,

We disagree that the parties have meaningfully met and conferred regarding each item contained in the draft November 26 discovery letter to Judge Burke and so we thank you for agreeing that an additional meet and confer can be productive. The following suggestions are made in furtherance of resolving the disputes between the parties below and look forward to discussing the same with you in hopes of reaching an amicable resolution.

FreightCar's Interrogatory No. 6

At FreightCar's request, NSC has supplemented its response to this Interrogatory twice to address alleged issues raised by FreightCar. FreightCar has failed to identify a single remaining deficiency with NSC's response and NSC has explained that its response is complete. Rather than ascertain an actual deficiency, FreightCar speculates about hypothetical ways that NSC might seek to amend its response if it learns new information.

There does not appear to be a dispute between the parties. Please be prepared to articulate the dispute during our meet and confer.

FreightCar's Search Terms 1, 2b, and 8

NSC has twice proposed narrowed alternatives for each of these terms, addressing any concerns raised by FreightCar regarding the potential exclusion of relevant information. NSC has explained to FreightCar how each proposed alternative is properly tailored to capture relevant information. FreightCar has failed to explain how its proposed term captures additional relevant information or even identify the sought-after information. FreightCar has also since refused to provide any narrowed alternatives.

In yet another attempt to reach an agreement, NSC proposes the following alternatives:

*Term 1*

("Freight Car America" OR FreightCar\* OR FCA\*) AND ("Canadian National" OR CN\* OR presentation\* OR memo\* OR slide\* OR report\* OR inspect\* OR "site visit" OR analy\* OR compar\*) AND (("open hopper"~3) OR "ore car" OR jenn\*)

This proposal hits on 7,000 documents (including attachments), which is beyond what NSC would typically agree to review, but NSC is willing to do so to avoid a dispute. This proposal maintains the thrust of FreightCar's current proposal and further tailors the same to hit on documents which mention the type of railcars which are at issue in this case.

*Term 2b*

("Canadian National" OR CN) AND (("open hopper"~3) OR "ore car" OR jenn\*) AND (problem\* OR hinge\* OR require\* OR want\* OR prefer\*) for the time periods 2007.01.01-2009.09.11 and 2018.01.01-2023.12.31.

This proposal hits on over 15,000 documents (including attachments). This proposal maintains the thrust of FreightCar's current proposal and further tailors the same to hit on documents which mention the type of railcars which are at issue in this case.

*Term 8*

(jennies OR jenny OR "ore car" OR "freight car" OR "gondola car") AND ("Canadian National" OR "CN") AND (improve\* OR advantage\*) for the time periods 2007.01.01-2009.09.11 and 2018.01.01-2024.05.27.

This proposal hits on nearly 8,000 documents (including attachments). This proposal maintains the thrust of FreightCar's current proposal and further tailors the same to hit on documents which mention "Canadian National" or CN. All of the railcars at issue in this case were designed and built for Canadian National.

FreightCar RFP Nos. 61-63, 65-68, 70-71, and 73-74

*No. 61*

NSC has already stated it has searched for and produced documents responsive to this Request. *See* 2025.11.19 Letter from Keeler to J.Gillett. Accordingly, NSC does not understand what the dispute is regarding this Request. Please be prepared to articulate the same at the meet and confer.

*Nos. 62, 66, 71, and 74*

NSC has already searched for and produced documents responsive to these Requests regarding the 2009 NSC Jennies or railcars for use on the DMIR. *See* 2025.11.19 Letter from Keeler to J.Gillett. NSC understands that there is a pending motion with the Court regarding the scope of discovery regarding FreightCar's overbroad definition of "Jennies." FreightCar has not articulated an additional dispute.  Please be prepared to articulate a dispute for our consideration at the meet and confer.

*No. 63*

NSC offered to produce documents responsive to this Request regarding gondola railcars. *See* 2025.11.19 Letter from Keeler to J.Gillett. FreightCar's November 25 correspondence states that offer would exclude incremental expenses and profits, without any discussion. Please be prepared at the meet and confer to articulate FreightCar's reasoning for rejecting this proposal.

*No. 65*

NSC offered to produce documents responsive to this Request regarding gondola railcars. *See* 2025.11.19 Letter from Keeler to J.Gillett. FreightCar's November 25 correspondence complains that the scope of documents NSC has agreed to produce *may* not be sufficient for FreightCar to adjust NSC's forecast for the 2024 NSC Jennies. Accordingly, there may not be a dispute regarding NSC's production. Please be prepared to articulate the dispute at the meet and confer.

*Nos. 67 and 68*

NSC offered to produce documents responsive to these Requests regarding market share and production. *See* 2025.11.19 Letter from Keeler to J.Gillett. FreightCar's November 25 correspondence fails to explain why, despite the burden to NSC, FreightCar requires information beyond what NSC has agreed to produce.  Please be prepared to articulate the dispute at the meet and confer.

*No. 70*

NSC offered to produce documents responsive to this Request regarding number of railcars produced. *See* 2025.11.19 Letter from Keeler to J.Gillett. FreightCar's November 25 correspondence provides no reason why, despite the burden to NSC, FreightCar requires information beyond what NSC has agreed to produce. Please be prepared to articulate the same at the meet and confer.

*No. 73*

NSC offered to produce documents responsive to this Request regarding the Asserted Patents. *See* 2025.11.19 Letter from Keeler to J.Gillett. FreightCar's November 25 correspondence does not state whether that offer is acceptable. Accordingly, NSC does not agree that the parties have a dispute. Please be prepared to articulate the dispute at the meet and confer.

NSC's Search Terms 3-8

*Term 3*

Term 3 is: (DMIR OR "Duluth Missabe and Iron Range" OR "ore car") AND (CN OR "Canadian National" OR @cn.ca)

FreightCar has failed to respond to NSC's request that FreightCar reconsider its position regarding this term, as it is limited to the customer and the rail road upon which the FreightCar railcars that copied NSC's patented design are used. *See* 2025.11.28 Letter from Keeler to J. Gillett re Search

Terms. Indeed, FreightCar's reported hit count for this term of 18,000 documents is not unreasonable, particularly since NSC has agreed to run searches which hit on a similar number of documents (*see, e.g.*, FreightCar's Term 2b above). NSC again requests that FreightCar reconsider its position regarding this term.

> *Term 4*

Term 4 is: `(Inspect* OR report) AND ("NSC" OR "National Steel Car" OR CN OR "Canadian National" OR DMIR OR "Duluth Missabe and Iron Range" OR "ore car")`

NSC appreciates FreightCar's identified burden of reviewing over 70,000 documents. Given FreightCar's insistence on bringing this matter before Judge Burke, NSC proposes the following two narrowed alternatives in an effort to reach an amicable agreement regarding this search term:

> `(Inspect* OR report) AND ("NSC" OR "National Steel Car" OR CN OR "Canadian National") AND`~~`OR`~~` (DMIR OR "Duluth Missabe and Iron Range" OR "ore car")`

> `(Inspect* OR report) AND ("NSC" OR "National Steel Car" `~~`OR CN OR "Canadian National"`~~` OR DMIR OR "Duluth Missabe and Iron Range" OR "ore car")`

Please provide hit counts for both alternatives and indicate whether FreightCar would agree to run either search term.

<u>NSC Search Term 5, 6, 7, and 8</u>

FreightCar has failed to inform NSC whether it will run these search terms, despite repeated requests from NSC. *See* 2025.11.20 Letter from Keeler to J.Gillett; 2025.11.28 Letter from Keeler to J.Gillett re Search Terms. At the meet and confer, please be prepared to discuss these search terms including whether FreightCar assents to the same and any proposed alternatives, including hit counts for both.

<u>FreightCar's WhatsApp and Teams Messages</u>

FreightCar has repeatedly failed to inform NSC whether it will collect and search the WhatsApp and Teams messages of its identified custodians. See 2025.11.20 Letter from Keeler to J.Gillett re WhatsApp and Teams; 2025.11.28 Letter from Keeler to J.Gillett re Discovery. NSC has repeatedly stated that its identified custodians did not use WhatsApp or Teams during the relevant time periods. Please be prepared to discuss these relevant forms of ESI at the meet and confer including whether FreightCar assents to search the same.

<u>FreightCar's Metadata</u>

FreightCar has failed to revert regarding its burden of producing the required metadata for its CAD files, as promised during the November 4 meet and confer. *See* 2025.11.06 Letter from Keeler to J.Gillett. Please be prepared to discuss the same at the meet and confer.

FCA0042807

FreightCar has failed to respond on whether it will produce all documents related to the February 10, 2023 email from ▮▮▮▮ with the subject ▮▮▮▮▮▮▮▮▮▮ Please be prepared to discuss the same at the meet and confer.


Regards,

ICE MILLER LLP

Robert D. Keeler

# Exhibit I



| 1500 Broadway | 29th Floor | New York, NY 10036 |

WRITER'S DIRECT NUMBER: (212) 824-4961
EMAIL: ROBERT.KEELER@ICEMILLER.COM

November 19, 2025

**Via Electronic Mail (justin.gillett@knobbe.com)**
Mr. Justin Gillett
Knobbe Martens Olson & Bear LLP
2040 Main St., 14th Fl.
Irvine, CA 92614

> ***RE:*** **NSC's Positions Regarding the Production of Financial Information**
> *National Steel Car Limited v. FreightCar America, Inc.*, Civ. No. 24-00594

Dear Justin,

Further to our November 4 meet and confer, we have spoken with our client and write to elaborate on NSC's positions regarding FreightCar's RFP Nos. 61-74.

**FreightCar's RFP No. 61**
"Communications with customers or potential customers discussing the Asserted Patents and/or patented features."

NSC has searched for and produced documents responsive to this Request.

**FreightCar's RFP No. 62**
"Communications with customers or potential customers discussing the 2009 NSC Jennies or other NSC Jenny."

NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case at least insofar as it relates to "other NSC Jenn[ies]." NSC will not search for or produce documents regarding "other NSC Jenn[ies]." NSC has produced documents regarding the 2009 NSC Jennies that are in NSC's possession and which were located after a reasonable search.

**FreightCar's RFP No. 63**
"Detailed NSC annual profit and loss statements for 2018–2026."

Although NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case, and without waiving its right to object to any further production, NSC is willing to produce additional documents showing profit and loss statements for gondola railcars for the requested time period. Please let us know if FreightCar is willing to accept this offer to compromise on this issue.

**FreightCar's RFP No. 64**
"Valuations of any Asserted Patent or of any collection of patents that includes one or more Asserted Patents."

NSC has searched for and does not possess documents responsive to this Request.

**FreightCar's RFP No. 65**
"Transaction data for sales of any NSC railcar from 2018–2026, including contract date, invoice date, invoice number, customer, model, quantity, type, price, costs of goods sold, manufacturing site, order date, ship date, and ship-to location."

NSC has produced information responsive to this Request regarding the 2009 NSC Jennies at issue. Although NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs this case, and without waiving its rights to object to any further production, NSC is willing produce additional documents for gondola railcars for the requested time period, and is working to determine which categories of requested information this will include. Please let us know whether FreightCar is willing to accept this offer to compromise on this issue.

**FreightCar's RFP No. 66**
"Forecasts or financial assessments related to any bid covering the 2009 NSC Jennies or other NSC Jenny since 2007."

NSC has produced forecasts and financial assessments related to bids for railcars for use on the DMIR which were located after a reasonable search. NSC otherwise maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case insofar as it relates to "other NSC Jenn[ies]."

**FreightCar's RFP No. 67**
"Forecasts and budgets for NSC's railcar-manufacturing segment and/or company as of 2018, 2019, 2020, 2021, 2022, 2023, 2024, 2025, and 2026."

Although NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case, and without waiving its right to object to any further production, NSC is willing to agree to produce additional documents showing market share and production for the requested time period. Please let us know whether FreightCar is willing to accept this offer to compromise on this issue.

**FreightCar's RFP No. 68**
"Forecasts and budgets for production of NSC railcars for each NSC plant (e.g., Hamilton, Ontario) as of 2018, 2019, 2020, 2021, 2022, 2023, 2024, 2025, and 2026."

Although NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case, and without waiving its right to object to any further production, NSC is willing to agree to produce additional documents showing market share and production for the requested time period. Please let us know whether FreightCar is willing to accept this offer to compromise on this issue.

2

**FreightCar's RFP No. 69**
"Monthly headcount for each NSC plant (e.g., Hamilton, Ontario) from 2018–2026."

Notwithstanding that NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case, as a compromise NSC agrees to produce documents responsive to the full scope of this Request.

**FreightCar's RFP No. 70**
"Manufacturing and production data for each NSC plant (e.g., Hamilton, Ontario) from 2018–2026 showing the number of railcars NSC manufactured each month."

Notwithstanding that NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case, as a compromise NSC agrees to produce documents showing the number of railcars produced by NSC each month for the requested time period.

**FreightCar's RFP No. 71**
"Competitive assessments, analyses, or communications discussing Greenbrier, ARI, Trinity, or any other competitor for the sale of railcars."

NSC has already produced documents responsive to this request regarding competitor's sale of railcars for use on the DMIR. NSC otherwise maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case insofar as it seeks documents unrelated to the specialty railcars used on the DMIR and fails to define "or any other competitor."

**FreightCar's RFP No. 72**
"Assessments, analyses, and communications regarding the ARI design used on the DMIR, including, but not limited to, similarities, differences, performance, quality, and customer concerns."

We understand that the "ARI design used on the DMIR" refers to the railcars ARI sold to CN in or around 2011. In view of this understanding, and although NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case, as a compromise NSC will produce responsive, non-privileged documents that are located after a reasonable search.

**FreightCar's RFP No. 73**
"Assessments, analyses, and communications regarding any suspected patent infringement by a competitor other than FreightCar America, including, but not limited to, by ARI."

Notwithstanding that NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case insofar as it relates to patents other than the asserted patents, as a compromise, NSC will produce responsive, non-privileged documents regarding the asserted patents that are located after a reasonable search.

3

**FreightCar's RFP No. 74**

"Warranty and service transaction data for all NSC Jennies, including customer, date of work, railcar number, location, designation as warranty or service work, type of repair, reason for repair, cost of service, and the party that incurred the expense of the repair."

NSC maintains its objections to this Request as overly broad, unduly burdensome, and not proportional to the needs of this case at least insofar as it relates to "all NSC Jennies." NSC will not search for or produce documents regarding "all NSC Jennies." NSC has produced documents responsive regarding the 2009 NSC Jennies at issue that are in NSC's possession and which were located after a reasonable search.

Regards,

Robert D. Keeler

4

# Exhibit J



| 1500 Broadway | 29th Floor | New York, NY 10036 |

WRITER'S DIRECT NUMBER: (212) 824-4961
EMAIL: ROBERT.KEELER@ICEMILLER.COM

December 11, 2025

**Via Electronic Mail (justin.gillett@knobbe.com)**
Mr. Justin Gillett
Knobbe Martens
2040 Main St., 14th Fl.
Irvine, CA 92614

> **RE:** *National Steel Car Limited v. FreightCar America, Inc.*, Civ. No. 24-00594

Dear Justin,

Thank you for the productive meet-and-confer on December 4. We write regarding that meet-and-confer and your December 4 correspondence concerning the same.

**FreightCar's Microsoft Teams and WhatsApp Messages**

At the December 4 meet-and-confer, FreightCar, for the first time, requested that NSC provide an authority supporting its position that FreightCar's Microsoft Teams and WhatsApp messages should be produced. NSC stated that discovery is broad, and that FreightCar's productions to date had already shown that relevant information is contained in FreightCar's identified custodians' Microsoft Teams and WhatsApp messages. *See* 2025.11.20 Letter from Keeler to J.Gillett re WhatsApp and Teams ESI; 2025.11.06 Letter from Keeler to J.Gillett re November 4 Meet and Confer.

Regardless, NSC provides the following authority to support its position that FreightCar must search and produce the Microsoft Teams and WhatsApp messages of its identified custodians:

- *RIG Consulting, Inc. v. Rogers*, 2025 WL 1349002 at *6 (W.D. Penn. May 8, 2025) (ordering production of Microsoft Teams messages).

- *Lashify, Inc. v. Qingdao Lashbeauty Cosmetic Co., Ltd.*, Civ. No. 6:22-cv-00776 (Dkt. 98) (ordering production of email and messaging platforms, including Skype, Zoom, WhatsApp, Microsoft Teams, Google Hangouts, Google Chat, Line, WeChat, KakaoTalk, Facebook Messenger, Telegram, Viber, Kik, Snapchat, Slack, Discord, and Instagram when Defendant's production did not include communications regarding their decision to copy Plaintiff's patent-practicing products).

- *Doe v. Carnival Corporation*, 2024 WL 4003709 (S.D. Fla. Feb. 22, 2024) (ordering production of WhatsApp messages).

- *Lubrizol Corporation v. International Business Machines Corporation*, 2023 WL 3453643 (N.D. Ohio May 15, 2023) (ordering production of slack conversations and Microsoft Teams messages).

Please confirm by Friday, December 12 that FreightCar will search its identified custodians' Microsoft Teams and WhatsApp messages.

**FreightCar's Interrogatory No. 6**

NSC appreciates FreightCar's explanation of the supplement it seeks to NSC's response to this Interrogatory. We are working with our client to determine whether an additional supplement to this Interrogatory is required and will revert promptly.

**FreightCar America's Search Terms for NSC's ESI**

Term 1

```
("Freight Car" OR FreightCar* OR FCA*) AND ("Canadian National" OR
CN* OR presentation* OR slide* OR report* OR inspect* OR "site
visit" OR analy* OR compar*)
```

At the December 4 meet-and-confer, FreightCar acknowledged that this term is unduly burdensome to the extent it would require NSC to review nearly 90,000 documents. As requested by FreightCar, the terms in the second clause were individually removed, in each instance resulting in a hit count that was over 80,000 documents with attachments, showing that no individual term in that clause is driving the hits. Accordingly, NSC respectfully requests that FreightCar reconsider NSC's proposed alternative for this term shown below.

```
("Freight Car America" OR FreightCar* OR FCA*) AND ("Canadian
National" OR CN* OR presentation* OR memo* OR slide* OR report* OR
inspect* OR "site visit" OR analy* OR compar*) AND (("open
hopper"~3) OR "ore car" OR jenn*)
```

Term 2b

Thank you for agreeing with NSC's alternative for this term as proposed on December 3.

However, FreightCar's December 4 correspondence includes "CN*" as opposed to "CN" in the first clause of this term. For clarity, NSC will apply this term as it appears in its December 3 correspondence and shown below:

```
("Canadian National" OR CN) AND (("open hopper"~3) OR "ore car" OR
jenn*) AND (problem* OR hinge* OR require* OR want* OR prefer*)
```
for the time periods 2007.01.01-2009.09.11 and 2018.01.01-2023.12.31.

Page **3**

Term 8

The modified term (jenny OR jennies OR "ore car" OR "freight car" ~~OR "gondola car"~~) AND (improve* OR advantage*) results in nearly 17,000 hits with attachments. This term remains overly burdensome and NSC cannot agree to run it on its ESI.

The modified term (jenny OR jennies OR "ore car" ~~OR "freight car" OR "gondola car"~~) AND (improve* OR advantage*) results in nearly 5,000 hits with attachments. NSC agrees to run this term on its ESI.

**NSC's Search Terms for FreightCar's ESI**

Term 3

(DMIR OR "Duluth Missabe and Iron Range" OR "ore car") AND (CN OR "Canadian National" OR @cn.ca)

Thank you for agreeing to run this term.

Term 4

(Inspect* OR report) AND ("NSC" OR "National Steel Car" OR DMIR OR "Duluth Missabe and Iron Range" OR "ore car")

(Inspect* OR report) AND ("NSC" OR "National Steel Car" OR CN OR "Canadian National") AND (DMIR OR "Duluth Missabe and Iron Range" OR "ore car")

Thank you for indicating that you are willing to run one of the two narrowed alternatives for this term as proposed by NSC in its December 3 correspondence. However, as requested in that correspondence, and again during the December 4 meet-and-confer, please provide hit counts for both of NSC's proposals so that NSC can adequately consider this compromise.

Terms 5-7

Thank you for agreeing to run these terms.

Term 8

FreightCar's offer to run this term if NSC agrees to also run the same on its ESI is not acceptable. As stated during the parties' December 4 meet-and-confer, FreightCar is only entitled to ten search terms under the Default Standard. NSC has agreed to run eight of FreightCar's proposed terms (Nos. 2a, 2b, 3, 4, 5, 6, 7, and 9) and FreightCar has two proposals outstanding (Nos. 1 and 8). Therefore, FreightCar does not have a "tenth term" as FreightCar purports in its December 4 correspondence.

However, if FreightCar wishes that NSC run this term in lieu of one of FreightCar's outstanding proposals NSC is agreeable to considering that compromise.

**NSC's Responses to FreightCar's Second Set of RFPs (Nos. 61-63, 65-68, 70-71, and 73-74)**

No. 61
"Communications with customers or potential customers discussing the Asserted Patents and/or patented features."

NSC has stated twice that it has already searched for and produced documents responsive to this Request. *See* 2025.11.19 Letter from Keeler to J.Gillett; 2025.12.03 Letter from Keeler to J.Gillett. NSC's search was reasonable and was not limited to any subset of documents responsive to this Request.

No. 62
"Communications with customers or potential customers discussing the 2009 NSC Jennies or other NSC Jenny."

NSC stated in its November 19 correspondence that it limited its search for documents responsive to this Request to the 2009 NSC jennies and other jennies for use on the DMIR. *See* 2025.11.19 Letter from Keeler to J.Gillett. This search has resulted in the production of countless documents directly bearing on the issues in this matter; other "Jennies" as defined by FreightCar lack connection to this case. NSC stands on its objections that this Request is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks information for "other NSC Jenn[ies]."

Nos. 63
"Detailed NSC annual profit and loss statements for 2018–2026."

NSC produced statements showing revenues and costs of goods sold for flats, gondolas, hoppers, sparger hoppers, and intermodal railcars for the requested time period. *See* NSC063623-63626, NSC063635-063650. NSC also produced a breakdown of revenues and costs of goods sold for each order of gondola railcars for the requested time period. *See* NSC063627-63634. Please confirm that these documents satisfy what was requested by FreightCar, as other documents have attenuated relevance.

No. 65
"Transaction data for sales of any NSC railcar from 2018–2026, including contract date, invoice date, invoice number, customer, model, quantity, type, price, costs of goods sold, manufacturing site, order date, ship date, and ship-to location."

NSC has produced information responsive to the full scope of this Request for the 2009 NSC jennies. *See* 2025.11.19 Letter from Keeler to J.Gillett. Regarding other NSC railcars, NSC stands on its objections that this Request as overly broad, unduly burdensome, and not proportional to the needs of this case. However, NSC has produced additional documents responsive to this Request regarding gondola railcars for the requested time period. *See, e.g.,* NSC063627-63634.

No. 66
"Forecasts or financial assessments related to any bid covering the 2009 NSC Jennies or other NSC Jenny since 2007."

NSC stated in its November 19 correspondence that it limited its search for documents responsive to this Request to the 2009 NSC jennies and other bids regarding jennies for use on the DMIR. *See* 2025.11.19 Letter from Keeler to J.Gillett. NSC has produced documents showing forecasts and actual sales for such railcars. NSC stands on its objections that this Request is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks information for "other NSC Jenn[ies] since 2007."

No. 67
"Forecasts and budgets for NSC's railcar-manufacturing segment and/or company as of 2018, 2019, 2020, 2021, 2022, 2023, 2024, 2025, and 2026."

NSC stated in its November 19 correspondence that it has already produced budgets and forecasts related to bids for railcars for use on the DMIR which were located after a reasonable search. *See* 2025.11.19 Letter from Keeler to J.Gillett. Despite FreightCar's lack of reply to this correspondence, in an effort to reach a compromise, NSC has produced documents showing market share and production for the requested time period. *See* NSC063651, NSC063653-63654. NSC stands on its objections that this Request is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks information for NSC's entire "railcar-manufacturing segment" or "company." Further, NSC represents that financial documents produced are standalone for its manufacturing segment. *See, e.g.,* NSC063623-63650.

No. 68
"Forecasts and budgets for production of NSC railcars for each NSC plant (e.g., Hamilton, Ontario) as of 2018, 2019, 2020, 2021, 2022, 2023, 2024, 2025, and 2026."

NSC stated in its November 19 correspondence that it has already produced budgets and forecasts related to bids for railcars for use on the DMIR which were located after a reasonable search. *See* 2025.11.19 Letter from Keeler to J.Gillett. NSC stands on its objections that this Request is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks information for all "NSC railcars" and each "NSC plant." However, in an effort to reach a compromise, NSC has produced documents showing market share and production for the requested time period. *See* NSC063651, NSC063653-63654.

No. 70
"Manufacturing and production data for each NSC plant (e.g., Hamilton, Ontario) from 2018–2026 showing the number of railcars NSC manufactured each month."

NSC has produced information for the number of railcars manufactured on a monthly basis for the requested time period. *See* NSC063653-63654.

No. 71

"Competitive assessments, analyses, or communications discussing Greenbrier, ARI, Trinity, or any other competitor for the sale of railcars."

NSC stated in its November 19 correspondence that it has already produced any assessments, analysis, or communications regarding competitor's sale of railcars for use on the DMIR. *See* 2025.11.19 Letter from Keeler to J.Gillett. NSC stands on its objections that this Request is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks information for the sale of all railcars.

No. 73

"Assessments, analyses, and communications regarding any suspected patent infringement by a competitor other than FreightCar America, including, but not limited to, by ARI."

NSC stated in its November 19 correspondence that it will produce responsive, non-privileged documents regarding the Asserted Patents that are located after a reasonable search. *See* 2025.11.19 Letter from Keeler to J.Gillett. NSC stands on its objections that this Request is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks information for patents other than the Asserted Patents.

No. 74

"Warranty and service transaction data for all NSC Jennies, including customer, date of work, railcar number, location, designation as warranty or service work, type of repair, reason for repair, cost of service, and the party that incurred the expense of the repair."

NSC stated in its November 19 correspondence that it has produced responsive, non-privileged documents regarding NSC's 2009 patent-practicing jennies that were located after a reasonable search. *See* 2025.11.19 Letter from Keeler to J.Gillett. NSC stands on its objections that this Request is overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it seeks information for "all NSC Jennies."

**NSC's Interrogatory No. 12**

During the November 4 meet and confer FreightCar promised to confirm whether it will supplement its response to this Interrogatory. *See* 2025.11.06 Letter from Keeler to J.Gillett re Meet and Confer. FreightCar has not done so. Please do so by Friday, December 12.

**IFO, VOB, and MPG Files**

FreightCar has produced several IFO, BUP, and VOB/MPG files which appear to be copied from two separate DVDs with respective Bates ranges of FCA0082727-0082744 and FCA0082749-0082770. However, FreightCar did not provide metadata regarding custodian or file path for these files, so it is impossible for NSC to know where these files came from or how they are grouped. Please confirm whether NSC is correct that the above-listed files are from two separate DVDs and please provide the name and source of the same. If preferrable, please produce ISO files of those DVDs and confirm to which the above-referenced Bates-ranges they apply.

Regards,
ICE MILLER LLP

Robert D. Keeler